## MARTIN and others *v.* NORTHWESTERN FUEL Co.[1]

*(Circuit Court, D. Minnesota. December Term, 1884.)*

SALE—OFFER AND ACCEPTANCE BY TELEGRAPH—CONSUMMATION OF CONTRACT.
On December 30th N. W F. Co. telegraphed to M: "Are you prepared to make me price by telegraph to-morrow for 40,000 tons coal? Advise by wire, quick." M. telegraphed next day: "Quantity named, delivered afloat, Toledo or Cleveland, as most convenient for both, in about equal monthly installments during navigation, two eighty per ton, or two seventy if all taken by October 1st; both ninety days." N. W. F. Co. telegraphed: "Telegram received. Price too high to secure trade. Want to buy this coal of you. Will give you until 6th to figure freights and do better." On January 4th M. telegraphed: "Two fifty-five, free on board vessels, Cleveland and Toledo, provided quantity named is taken before October 1st, in about equal monthly installments; terms, ninety days. Bulk would probably go via Cleveland, as undoubtedly most convenient to both; but portion would have to go from Toledo. A possibly slightly

1 Reported by Robertson Howard, Esq., of the St. Paul bar.

lower offer from parties representing Sandusky, you can offset by unquestionably securing lower lake freights." On January 5th N. W. F. Co. answered: "Telegram received. You can consider the coal sold. Will be in Cleveland and arrange particulars next week." *Held,* that there was no definite contract and acceptance thereof.

At Law.

*Gordon E. Cole* and *W. D. Cornish,* for plaintiffs.

*O'Brien & Wilson,* for defendants.

BREWER, J. In this case of *Martin & Co.* against *The Fuel Company* the question was argued yesterday afternoon at great length, and, as the conclusion to which I have come is different from the impression which I formed when the matter was first presented, the counsel will bear with me if I state in detail the reasons which have led me to my conclusion,—a conclusion reached after examining the authorities cited, and after consultation last night with my brother NELSON.

I do not think there is any very great difference between counsel as to the rule of law that is applicable to cases of this kind. The question is, as stated by Gen. Cole, as to the application of that rule to the particular facts of this case. Of course, a contract can be entered into by telegram or letter just the same as it can be if parties sit down and reduce their agreement to writing, and the only question is, have they by these letters or telegrams come to a definite conclusion,—a proposition on one side, followed by a definite acceptance on the other? and where language is open to possibly two or three constructions, we have to look at the surrounding situation to determine what the parties meant by it. The question is, what was intended by the language which was used? Briefly, on December 30th, the defendant telegraphed to plaintiffs: "Are you prepared to make me price by telegraph to-morrow for 40,000 tons," and so on. "Advise by wire, quick." To that an answer was sent on the next day: "Quantity named delivered afloat, Toledo or Cleveland, as most convenient for both, in about equal monthly installments during navigation, two eighty per ton, or two seventy if all taken by October 1st; both ninety days." The defendant declined that proposition in these words: "Telegram received. Price too high to secure trade. Want to buy this coal of you. Will give you until 6th to figure freights and do better." Of course, if there had been nothing beyond that, it would end the matter; but, on the fourth of January, the plaintiff telegraphed in this language: "Two fifty-five free on board vessels, Cleveland and Toledo, provided quantity named is taken before October 1st, in about equal monthly installments; terms, ninety days. Bulk would probably go via Cleveland, as undoubtedly most convenient to both, but portion would have to go from Toledo. A possibly slightly lower offer from parties representing Sandusky, you can offset by unquestionably securing lower lake freights." That dispatch was sent on the 4th, and answered on the next day in this language: "Telegram received.

You can consider the coal sold. Will be in Cleveland and arrange particulars next week."

Now, did that make a definite contract between the parties,—a direct, unqualified acceptance of the terms offered? "You can consider the coal sold." Of course, that refers to the coal as offered upon the terms named in the telegram as to delivery, amount, price, etc. "Will be in Cleveland and arrange particulars next week." Does that operate as a limitation upon the forepart of this telegram? Does it mean to say, Your offer is accepted; we will take that coal,—consider the trade closed,—and next week I will be down to arrange for the shipment, the transportation from Cleveland and Toledo? or does it mean, You can consider that this offer that you have made will be accepted; that the terms of the contract—the details—will be arranged between us when I come next week? If it means the latter,—that there were details, particulars, to be arranged,—then there was no definite, final, irrevocable, absolute acceptance. If it refers (as was argued very forcibly) to the mere matter of arranging for the shipment, why, then, it is an outside matter; it is subordinate to the contract which was accepted by the forepart of the telegram. Of course, it is difficult to say positively what the parties intended; but it is a telegram from the proposed vendee to the proposed vendor, that he will come to the latter's place of business (Cleveland) and will arrange particulars. Naturally, you would think that that would refer to arranging with him (the vendor) the particulars.

Doubtless, as appears from the testimony given by Mr. Martin, (the only oral testimony,) the principal thing was the matter of transportation. But just see how the case stands in that respect. The defendant, as appears, had no transportation, and had to arrange for transportation. The proposition is, deliverable free on board at Cleveland or Toledo, in about equal monthly installments, bulk to go via Cleveland, but a portion must go by Toledo. Transportation must be arranged. Whether it was the duty of the vendor or vendee to arrange for the transportation, it *had* to be arranged for; transportation must be provided; and, obviously, from the testimony, that was the main thing which was in the mind of the defendant in going to Cleveland; so, Mr. Martin says, he told him. But whether that transportation could be secured for the greater portion at Cleveland,—whether it could be secured for 7,000 tons a month, or for only 5,000 tons a month,—was a matter as yet unknown. It was to be delivered in equal monthly installments, and I take it that, fairly construed, the delivery would commence when navigation opened, inasmuch as vessel transportation was contemplated. As that is said to be the first of April, or thereabouts, from that to the first of October would be five months, making a monthly installment of about 8,000 tons, "the bulk via Cleveland." Now, until the vendee had ascertained that he could make arrangements for transporting 7,000 tons, or any other definite amount, from Cleveland, could it be said that he had

intended to finally consummate the contract, and that the amounts to be delivered at Cleveland and Toledo, respectively, were left fully to the determination of the vendor; that the latter could say, on the first of April, here is 7,000 tons at Cleveland, and 1,000 tons at Toledo, and you must take that, whether or no you have been able to make any arrangement for the transportation of such a bulk or not. To what place was this to be transported? It appears from subsequent letters that part of it was to go to Duluth, and part of it to Milwaukee. Perhaps the season would open to Milwaukee earlier than it would to Duluth, and the vendee (none of these particulars as to the amount to be delivered at other places being settled) would place himself in the position that, on the first of April, desiring, perhaps, to make the first shipment to Duluth, he could not then ship it at all; or, at best, only certain proportions from Toledo and Cleveland, respectively. The transportation was unsettled; the exact amount that was to be delivered in either place was unsettled; the exact time, whether the first of the month or the middle of the month, was unsettled; the notice that was to be given of the arrival of the coal at Toledo or Cleveland was unsettled. These were all details, particulars, in the language of the telegram, which, if a contract had been once signed with those things unsettled, might, as counsel say, be within the control of the vendor; but, where there was only this proposition and answer by telegram, and those things unsettled, it seems to me that they are details and particulars which it may well be considered the party had in mind when he said: "I will come to Cleveland and arrange particulars next week." So that, while the transportation was the main underlying fact, yet the transportation affected these particulars; and when the defendant says, "You may consider the coal sold; will come to Cleveland and arrange particulars,"—he meant that if these particulars can be satisfactorily arranged the contract is consummated; and that he left those particulars to be settled by arrangements made at Cleveland.

Now, the case that was cited from Barbour, it seems to me, is very closely in point. There the letter of acceptance was: "I will take 10,-000 bushels of malt, deliverable at such a wharf, at such a price, describing the malt, etc. Will be up and see you next week." And the court said that, notwithstanding the distinct acceptance of the offer, yet it was followed by the statement that he would be up next week to see him, which, taken with a similar statement in a prior letter, carried with it the implication that he was to come to make an examination to see that the malt corresponded with the description in the letters of proposal and acceptance. Here the defendant says, "You can consider the coal sold." My brother NELSON suggested whether that was not of itself a qualified acceptance. It is not, "I accept your offer," but "you may consider the coal sold." It is not, perhaps, a natural expression when a definite acceptance of an offer is intended. It is more equivalent to this: "There is so little to be

settled, and I am so sure that all can be arranged, that you are safe in looking upon the sale as closed, and prepare to make your arrangements accordingly. You may consider—you may understand—that this contract is going to be consummated, and that I will come to Cleveland and we will fix it up."

So it seems to me that the telegram carrying to the proposed vendor, a statement from the proposed vendee that he will come to Cleveland, to his place of business, and arrange particulars, carries with it a fair implication that the particulars are to be arranged before the contract is finally consummated. Then you go on a little further, and you find that he did go to Cleveland, and, turning to the testimony which Mr. Martin gave of that interview, it seems to bear out this interpretation. Mr. Saunders comes there, and, after some conversation about the telegrams, he said: "Your first telegram was too high, but I will give you another chance; so I sent you my second telegram." And Mr. Martin says: "Well, the reason I put in my telegram of January 4th that a portion of the coal must go from Toledo, was because the railroad company had insisted upon that when I got the railroad rate from them on which I based this contract, on which I based this offer of coal to you. I thought, may be, that you might have thought that a little arbitrary, putting it in that way." He said, "No, not at all." He said, "We'll take the coal on the basis and terms of your telegram of January the 4th." That does not sound as though the contract had already been settled. "We'll take the coal on the basis and terms of your telegram of January the 4th." This implies a present and not a past contract. "I said to him, 'Now, Mr. Saunders, I have had a great deal of trouble in getting this freight rate, and I don't want any hitch to occur in lake transportation, in getting this coal off as specified, because it will involve us in trouble with the railroad companies.' He said, 'Oh, no; this is a ground-hog case.' He said, 'I've *got* to get the coal.' I told him he must give us timely notice of the arrival of vessels, and he said he would. There was something said about his getting transportation on the lake by ore vessels. He said that one of his main objects in coming to Cleveland was to arrange for the lake transportation of this coal, and that he had been figuring with Cleveland vessel owners." So it seems that one of the main things for which he had come was to arrange for lake transportation, and that he had made inquiries of Cleveland vessel owners, and after making such inquiries he comes, and then occurs the conversation in which he says, "We will take this coal upon the terms and basis of your telegram." When he leaves (after some conversation as to a particular mode of transportation) he says, "I will return the following week," but did not return. Mr. Martin writes to him on the 21st: "We learn with surprise that you are probably in St. Paul, as we expected from what you said that you would certainly stop here on your way back to draw up some sort of a memorandum of our contract, arranging for the

details, and also to see the party you speak of." Now, that plainly implies that Mr. Martin expected him to return, expected him to reduce to writing a memorandum of the contract between them, fixing and arranging these details; but it had not been done, and he is surprised that it has not been done. This language, of course, does not definitely prove that the telegrams had not consummated everything, but still carries very plainly, it seems to me, an intimation, an indication, that the parties then thought that these negotiations had got to be consummated by a definite contract. It is true that in other parts of this letter, as well as in subsequent letters of both Mr. Martin and Mr. Saunders, there is language which very plainly and unmistakably implies the making of a contract,—that a contract has been made. And yet that language must be taken as used after this parol talk, in which, as Mr. Martin testifies, Mr. Saunders definitely says to him, "We'll take the coal on the basis and terms of your telegram." Of course, if it refers to that, it does not help, it does not uphold, the contract, which must be in writing, and evidenced by the telegrams. It is explainable as referring to that talk between them. For if that talk was binding upon both parties, then there would be unquestionably a contract, because there was no proviso, no limitation.

The language was as direct, unqualified, and unlimited as language can be: "We'll take the coal on the basis and terms of your telegram of January 4th." And so, the parties evidently not contemplating any subsequent trouble, considered this; spoke of it as though that oral talk consummated the contract. That, I think, explains the other language which is used in these subsequent letters, which obviously refers to a contract, and it does not necessarily go back to the telegrams which passed between the parties, and Mr. Martin's letter, in which he expressed surprise that Mr. Saunders had not stopped and drawn up a memorandum of a contract, arranging for these details, coupled with the facts stated in the telegram, that Mr. Saunders would come to Cleveland and arrange particulars, and back of that the fact that the lake transportation must necessarily have affected the amount of coal which was to be delivered at one place or the other; all seem to indicate that the parties could not have understood that all the details of the contract had been reduced to writing and agreed upon.

As I have said, when counsel first stated the proposition yesterday my impressions were the other way; that the language of the letters could only be taken as referring back to the original telegrams, and that whatever of ambiguity there might be in that last telegram must refer to outside matters, ancillary and subordinate to the contract. I have thus taken the opportunity to state in detail the conclusion to which, upon the authorities and my examination, I have come. Of course, it is a case of considerable magnitude, and one in which the amount in controversy is such that it can be easily taken to the su-

preme court; and if I have made a mistake in my conclusions in that respect, that court will correct it. Any shape that the counsel desire to put it in, in order to make the record clear for such review, they may pursue. Plaintiff's counsel duly excepted to the ruling.