# Sayre *v.* Wilson & Ingram.

*Action to recover Broker's Commissions on Sale.*

86　151
116　397
86　151
d142　320

1. *Broker's commissions on sale; when recoverable.*—A broker, or
real-estate agent, employed to effect a sale of land on specified terms,
becomes entitled to his commissions, or agreed compensation, when he
procures a purchaser who is able, willing and ready to buy on the terms
specified, and the vendor accepts him, although the sale is never con-
summated by reason of the vendor's fault; but a married woman,
being incapable of binding herself for the deferred payments of pur-
chase-money, is not a purchaser whom the vendor is bound to accept;
yet, if he knows her *status*, and does not object on that account, or
declines to consummate the sale on some other ground, this is a waiver
of the objection, and he can not set it up in defense of an action by the
agent for his compensation.

2. *Sufficiency of complaint*—In an action by a broker, or real-estate
agent, to recover agreed commissions for effecting a sale, it is not
enough to aver in the complaint that he procured a purchaser, and that
the defendant refused to consummate the sale, but he must allege, also,
that the purchaser was able, ready and willing to consummate the sale.

3. *Parol evidence affecting writing.*—Where the contract between the
parties, as shown by their correspondence, does not specify the com-
missions or rate of compensation to be paid to the agent, oral evidence
of an antecedent agreement as to that matter may be received; but the
principle can not be extended to oral evidence as to an agreement for
the insertion of restrictions or special stipulations in the deed to a pur-
chaser, outside of the usual provisions in a deed with warranty.

4. *Exhibits to letter, as part of contract.*—Inclosures in a letter,
therein referred to, and properly identified, are to be regarded as a part
of the letter itself.

5. *Rate of compensation to agent, under or without special contract.*
When an agent sues to recover compensation for services rendered for
his principal under a special contract of employment, his compensation
must be determined by the special contract, if therein specified; and if

[Sayre v. Wilson & Ingram.]

not, he can only recover a fair and reasonable compensation, as shown by ordinary and customary charges for like services in the community.

6. *Contract consummated by letter; later letter not received.*—An agent being authorized to effect a sale at a specified price, by letter from his principal received through the post-office, and having effected a sale on the terms specified; his right to compensation is not affected by a subsequent letter, which he never received, placing a higher price on the lot.

7. *Testimony of partner, as to letter addressed to partnership.*—In an action by a partnership, for services rendered in effecting a sale as agents for defendant, the defendant insisting that the terms of sale were modified by a subsequent letter addressed by him to them, one of the plaintiffs may testify that they never received the letter.

8. *Mistake of agent as to identity of lot sold.*—If the agent, having effected a sale according to the terms specified, withdraws from the contract because of a supposed mistake as to the identity of the lot, while his principal, not being under any mistake as to the identity of the lot, desires to procure a higher price for it, this does not affect the agent's right to recover compensation as on a sale.

9. *Statute of frauds, as to contracts required to be in writing.*—In an action by an agent against his principal, to recover commissions or compensation on sales of land, the statute of frauds is not available as a defense (Code, § 1732), although it does not appear that the contracts of sale were in writing as required by the statute.

APPEAL from the Circuit Court of Montgomery.

Tried before the Hon. JOHN P. HUBBARD.

This action was brought by Wilson & Ingram, partners in business as real-estate brokers and agents in Birmingham, against Calvin L. Sayre, claiming $250, "with interest thereon from June 1st, 1886, for negotiating the sale of two lots in the city of Birmingham, now or lately belonging to defendant; one being on Fifth Avenue in said city, sold by plaintiffs for defendant, at his request, on or about March 27th, to W. D. & C. H. Mills; and the other on Sixth Avenue, sold by plaintiffs for defendant, on or about May 24th, 1886, to Mrs. Metta Mayberry." The complaint alleged that defendant employed plaintiffs, as real-estate brokers, to sell said lots, "agreeing to pay them for such service all over $1,100 that might be obtained from the sale of said first lot, and five per-cent. of the purchase-money of the second lot, provided it sold for $3,000 or more;" that they offered said lots for sale, "and found purchasers therefor, at the price of $1,200 for the first lot, and $3,000 for the second; and that defendant, after plaintiffs had found purchasers as aforesaid, refused to carry out and conform to the sales so made," &c. The complaint also contained the common counts. The defendant demurred to the special count, "because it does not allege that said supposed purchasers were able, ready and willing to carry out said alleged purchases, and does not

show that they were in any way bound to carry out said alleged purchases." The court overruled the demurrer, and the defendant then pleaded the general issue and the statute of frauds; but the court sustained a demurrer to the latter plea.

It was shown on the trial, as appears from the bill of exceptions, that the negotiations between the parties were conducted by correspondence through the mails, and commenced with a letter from plaintiffs to defendant, which was dated February 6th, 1886, and in which, after mentioning a former personal interview, they asked him to state "best terms and prices." The defendant's reply to this letter is without date, and in these words: "Yours received, in regard to some property I own in your city. As to the two houses and lots on Sixth Avenue, I will take $3,000 each for them; $1,500 cash, and balance in twelve months, with interest. I send you plat for the unsold lots in the square, with the prices for each lot and the corners. As I have already paid the commissions, I want them to net me the amount stated in the plat." The plat is not set out in the record, nor is it stated that it was produced on the trial; but Wilson, one of the plaintiffs, testified that the price of lot No. 7, the lot sold to Mills, was fixed in the plat at $1,100, "and the corner lots at $3,000 each." On the 12th March, the plaintiffs negotiated a sale of one of the corner lots, at $3,000, to Mrs. Steele, and so informed defendant by letter, and on the 18th March sent him a warranty deed for his signature; and on the 27th March, as Wilson testified, they received from the defendant a deed to Mrs. Steele, "which contained conditions, that no church or store should ever be erected on the premises, and that no negro should live on the premises except as a domestic servant." Mrs. Steele objected to the insertion of these provisions in the deed to her, as the correspondence of the parties shows; but the sale seems to have been consummated, or at least, no controversy arose in this case as to the plaintiffs' commissions on it. On the day this was received, plaintiffs had negotiated a sale of lot No. 7 to Messrs. Mills, at the price of $1,200 cash, which was paid to them, and they so informed defendant by letter; and afterwards, on the same day, they wrote another letter, expressing surprise at the conditions inserted in the deed to Mrs. Steele, and adding: "We fear the same trouble may arise in regard to sale we made this morning, as one man in a thousand would hardly accept such a deed." Afterwards,

but before the 8th May, as Wilson testified, defendant went to Birmingham, and had a personal interview with Wilson, "about the sale to Mills, and said that plaintiffs ought to put the commissions on that sale at five per-cent., instead of the $100; to which witness replied, that they would do it if defendant would average up the commissions on the Steele lot; to which defendant made some jocular reply, and nothing more was said about commissions; that he mentioned to Sayre, in this conversation, that if he would strike out the restriction as to the store, as he had done in Mrs. Steele's deed, it would be satisfactory to Mills; to which defendant replied, 'All right, he would do so.'" On May 8th, as Wilson further testified, "defendant wrote to plaintiffs, that he had not sent the deed because he considered that the Messrs. Mills had not accepted his conditions." The plaintiffs replied to this letter, under date of May 10th, saying: "Messrs. Mills bought the lot of us not knowing of the terms you refer to, and they have not been here since; so you are wrong in declining to make them a deed on the ground that they would not accept terms, which had never been proposed to them. We did not inform you that they objected, but said we feared they would, as Mrs. Steele had done so. To the contrary, on that day, after the sale had been made to them, when we were informed as to the exclusion of the negroes, we mentioned it to them, and *he* did not object; and our Mr. W. told you of it. If you had intended to decline, you should have done so long since, as we have had their money since March 27th."

On May 24th, plaintiffs wrote to defendant, stating that they had sold "lot and dwelling on Sixth Avenue to Mrs. Metta Mayberry, for $3,000," and asking him to forward deed. This house and lot was at the time occupied by Judge Sharpe, and is called the Sharpe lot in the subsequent correspondence of the parties. On receiving plaintiffs' letter, defendant at once telegraphed to them withdrawing the Sharpe lot from market, "knowing that it was the lot described in said letter;" and afterwards, on the same day, he wrote as follows: "In accordance to our arrangement and letter to you some time since, I wrote that I would take $3,000, one half cash, and the other half on twelve months, with mortgage, for house and lot now occupied by Mr. Greene; and if that is the one you have sold, I will confirm the sale by paying you same commissions as agreed on, and that I have paid you on other sales; but, as to the house

[Sayre v. Wilson & Ingram.]

and lot now occupied by Judge Sharpe, I withdraw that from the market for the present. If you will look at the letter I wrote you about the houses, you will see that I offered this one for $3,000, and the one occupied by Judge Sharpe for $3,250." Plaintiffs at once replied to this letter, saying, "We have never received any letter reducing us to half commissions;" and that they had withdrawn the Sharpe lot from market, as instructed. On the next day, having discovered, as Wilson testified, that the lot sold to Mrs. Mayberry was the Sharpe lot, they wrote to defendant, informing him of the fact, and saying that they would endeavor to get Mrs. Mayberry to take the other lot; but the sale was never consummated, Mrs. Mayberry having left the city, after depositing the cash payment in bank. As to the letter fixing the price of the Sharpe lot at $3,250, the defendant testified that it was written by him some time between March 17th and May 8th, and mailed to the plaintiffs on the same day, postage paid; while Wilson testified, "that this letter was never received; that he had full and free access to all the correspondence of the firm, and examined all the letters." In the argument to the jury, counsel for the defendant commented on the fact that Wilson only had testified that plaintiffs had never received this letter; and the court thereupon charged the jury, on their request for further instructions, that Wilson's testimony was evidence that plaintiffs had never received the letter.

The defendant, testifying as a witness for himself, proposed to state that, in the personal interview between himself and Wilson, before plaintiffs' first letter was written, he informed Wilson that all sales were to be subject to his confirmation, and also as to the conditions he would insert in the deeds; and that, in the same conversation, "he and Wilson agreed on the compensation to be paid plaintiffs, in case they made any sales for him." The court excluded each part of this evidence, on motion of plaintiffs, and defendant excepted.

The rulings of the court on the pleadings and evidence, several charges given, and the refusal of several charges asked, are assigned as error.

TROY, TOMPKINS & LONDON, for appellant, cited *Coleman v. Meade*, 13 Bush, Ky. 358; *Gavock v. Woodlief*, 20 How. 221; *Dolan v. Scanlan*, 57 Cal. 263; 31 N. Y. 462; *Phelan v. Gardner*, 43 Cal. 306; *Tombs v. Alexander*,

[Sayre v. Wilson & Ingram.]

101 Mass. 255; 3 Keyes, N. Y. 203; *Henderson v. Vincent*, 84 Ala. 99; *Weaver v. Lapsley*, 42 Ala. 601; *Couch v. Woodruff*, 63 Ala. 466; *Huckabee v. Shepard*, 75 Ala. 342.

ROQUEMORE, WHITE & LONG, contra, cited *Chambers v. Seay*, 73 Ala. 372; *Henderson v. Vincent*, 84 Ala. 99. .

SOMERVILLE, J.—A broker who is employed to sell property on commission, earns his compensation, when he has been the efficient agent in procuring a satisfactory purchaser who is able, ready and willing to buy the property, on the terms fixed by the owner.   And if the sale is not consummated, by reason of the owner's fault, this fact is no bar to the recovery of commissions.—*Chambers v. Seay*, 73 Ala. 372; *Henderson v. Vincent*, 84 Ala. 99; *Vinton v. Baldwin*, 45 Amer. Rep. 447; *McClave v. Paine*, 10 Amer. Rep. 431. If an unsatisfactory purchaser is found—one who is not able or ready or willing to accept and perform the proffered terms —the owner may refuse to accept him, and is under no liability to pay the broker for his services.   The theory of the law is, that when the broker has brought the minds of the buyer and seller to an agreement upon all the terms of sale, and the buyer is able, ready and willing to buy, this is a constructive consummation of the sale, so far as the broker is concerned, because he has done all that he was required to do.   If he has negotiated to sell the property to a minor, or a lunatic, or a *feme covert*, or other person who is legally incapacitated to bind himself to perform the terms required, the owner may refuse to accept the proffered purchaser, and incurs no obligation to pay commissions for the service of procuring such a buyer.

The complaint was defective, in failing to aver that the purchasers, alleged to have been found by the plaintiffs, were able, ready and willing to carry out the alleged sale, or else to aver facts showing a waiver by defendant of these requisites.   The demurrer based on this defect should have been sustained, and the court erred in not doing so.

The sale of one of the lots owned by appellant is shown to have been contracted to be made to a married woman— one Mrs. Mayberry.   The terms of the sale provided for a cash payment of one-half of the purchase-money, and the remainder to be paid in twelve months.   A *feme covert* in this State being at that time incapable of binding herself personally for the payment of the purchase-money, the ap-

pellant could properly have objected to Mrs. Mayberry as an unsatisfactory purchaser. But, if he knew her *status*, and did not object for that reason, or declined to consummate the sale on other specified grounds, this objection must be construed to have been waived by him.

It was, in our judgment, competent to show by parol evidence a separate and distinct antecedent agreement, as to what commissions should be charged for brokerage. The correspondence of the parties, by which appellees were employed to make the sale, does not cover the question of compensation. The appellant Sayre's letter of authority only fixes the price and terms of sale, being responsive in this particular to the letter of the appellees, Wilson & Ingram, dated February 6th, 1886, which called for such terms. The contract of employment, as expressed in the correspondence, is not perfect and complete in itself, and shows on its face that it was not intended to regulate the subject of commissions, either expressly or by necessary implication. The case is one, therefore, where oral evidence is admissible to show a separate oral agreement collateral to the written contract, and not inconsistent with its terms, without infringing the rule excluding parol evidence of contemporaneous stipulations, which contradict or vary the legal effect of written instruments.—*Huckabee v. Shepherd,* 75 Ala. 342; *Welz v. Rhodius,* 44 Amer. Rep. 747; *West v. Kelly,* 19 Ala. 353; s. c., 54 Amer. Dec. 192; *Hersom v. Henderson,* 53 Amer. Dec. 185; 1 Stephen's Dig. Ev., Art. 90.

But it would, however, be straining the principle too far, we think, to authorize oral proof of an anterior agreement that the property was to be sold subject to Sayre's approval or confirmation, and that the deeds were to contain certain peculiar and unusual conditions, restricting the use to which the property was to be devoted. The written contract of employment authorizes a sale of the lots at specified prices and terms. This, by necessary implication, means an unconditional sale, without extraordinary or unusual conditions, with a conveyance by the usual warranty deed. These matters are not collateral to the subject-matter, or contract of sale, but are of the very essence of it. There was no error in excluding this evidence.

The letter of Sayre fixing the terms of sale, expressly made reference to a plat which he inclosed to the appellees, and also to the prices for each lot as marked on the plat. This made the plat a part of the letter, and the prices affixed

a part of the contract as fully as if incorporated in the body
of the letter.—*Oliver v. Ala. Gold Life Ins. Co.*, 82 Ala.
417.

If the evidence satisfactorily shows an agreement for a
particular compensation by way of commissions, that would,
of course, prevail. If not, then the plaintiffs would be enti-
tled to recover, if at all, a fair and reasonable commission,
subject to any limitations imposed by the terms of the con-
tract. Established and customary charges for like services
in the community would be competent evidence to prove what
was fair and reasonable.

If Sayre authorized the sale of the Sharpe lot at $3,000,
as shown by his letter introduced in evidence, and which
seems to be without date, and this letter was received by the
appellees, and under its authority they made a contract to
sell the lot, their right to compensation would not be preju-
diced by any letter which Sayre may have subsequently
written and mailed to them, increasing the price to be charged,
provided the letter was never received by reason of miscar-
riage or otherwise. The authority to sell, having been con-
ferred, could not be revoked by a lost letter, which never
came to the possession or knowledge of the broker or agent.

The testimony of Ingram—that the firm never received this
letter—was competent, to show that neither he nor his part-
ner, Wilson, had received it. Whether satisfactory or suffi-
cient to establish the fact, it was for the jury to say. This
would depend upon circumstances, including an inquiry as
to who generally controlled the correspondence; how and
where the letters were kept; what search had been made
for them among the firm correspondence, and other like con-
siderations.

If the plaintiffs agreed to withdraw the Sharpe lot from
market, at request of the defendant, after they had effected
a sale of it, and they did this under a mistake of its identity,
reasonably believing that Sayre's instruction to withdraw had
reference to a different lot, this mistake would not operate to
rescind the contract in regard to the sale of the Sharpe lot,
so as to prevent the plaintiffs from recovering commissions
for such sale, if they were otherwise entitled to it.

The plea of the statute of frauds was no answer to the
complaint. Admitting that the sale made by the brokers to
the proposed purchasers, the Messrs. Mills and Mrs. May-
berry, was voidable under the statute of frauds, because not
reduced to writing and signed by the party to be charged,

[Western Railway of Ala. v. Little.]

*that* is not the contract here in suit; and these purchasers, moreover, have not attempted to avoid its performance, but evince a readiness to comply with its terms. That they possessed the power to avoid it, would be immaterial to the plaintiffs' claim of compensation for bringing together the minds of the proposed seller and buyer, so long as no effort was made by them to avoid it. The demurrer to this plea was properly sustained.

These principles will be sufficient to guide the court upon another trial.

Reversed and remanded.