(113 So. 265)

## ALABAMA FUEL & IRON CO. v. ADAMS, ROWE & NORMAN. (6 Div. 804.)

Supreme Court of Alabama. May 19, 1927.

Rehearing Denied June 15, 1927.

**1. Brokers ☞54—Agent selling output of coal mine on commission held entitled to compensation when he procures purchaser able, ready, and willing to buy.**

Agent under contract for sale of entire output of coal on commission becomes entitled to his commission or agreed compensation when he has been the efficient agent in procuring a satisfactory purchaser able, ready, and willing to buy on owner's terms.

**2. Brokers ☞88(3)—Evidence relative to agent being procuring cause of sale of coal held for jury.**

In agent's action for commissions under contract for sale of coal, evidence relative to whether or not plaintiff was the efficient or procuring cause of sale on certain renewal contracts *held* for jury.

**3. Brokers ☞56(3)—That purchasers preferred dealing with owner would not bar agent of commissions.**

The fact that purchasers might prefer to deal with principal rather than agent would not bar agent of commissions if he was procuring cause of negotiations resulting in sale, even though negotiations were conducted and concluded by principal. ·

**4. Evidence ☞314(1)—Evidence that purchaser issued instructions not to negotiate contracts with agent held inadmissible in agent's action for commissions.**

In action for commissions under contract for sale of coal, evidence relative to purchaser having issued instructions not to negotiate contracts with agent *held* inadmissible under any exception to hearsay rule permitting circumstantial proof as to state of mind.

**5. Brokers ☞85(7)—Indorsements following signatures, that contracts were not made through agents, held properly excluded in agent's action for commissions.**

In agent's action for commissions under contract for sale of coal, evidence that contracts for purchase of coal bore indorsements following signatures to effect they were not made through agents *held*· properly excluded in that indorsements form no part of contract, and, in any event, had no bearing on agent's right of recovery.

**6. Evidence ☞471(2)—Witnesses ☞236(1)— Objections to argumentative questions, calling for legal conclusions, held properly sustained.**

In agent's action for commissions under contract for sale of coal, objections to questions asked plaintiffs', witness relative to his contention as to whether it was their efforts alone that secured contracts *held* properly sustained in that questions were argumentative and called for legal conclusions.

Appeal from Circuit Court, Jefferson County; C. B. Smith, Judge.

Action by Adams, Rowe & Norman, a partnership composed of W. C. Adams and E. J. Rowe, against the Alabama Fuel & Iron Company. From a judgment for plaintiffs, defendant appeals. Affirmed.

The contract sued upon is as follows:

"Agreement between Alabama Fuel & Iron Company,.a corporation (herein called the operator), and Adams, Rowe & Norman, a corporation (herein called the sales agent), witnesseth:

"In consideration of the mutual promises of the parties herein set forth it is agreed as follows:

"First. The operator hereby appoints the sales agent its exclusive agent to sell the entire output of coal produced at mines owned, controlled, or operated by or for the operator, situated in Alabama, from the date hereof as herein provided.

"Second. The operator now has certain bona fide contracts covering the sale of part of his output and made prior to the date hereof, and the sales agent agrees that the operator shall complete deliveries under such contracts; the mutual agreement being that the commissions on such coal are to' be paid by the operator to the sales agent, as shown on Exhibit 1 hereto attached and made a part hereof. On any renewal of such contracts and on all other contracts or sales, the operator agrees to pay the sales agent a commission of 5 cents per ton. All commissions due hereunder shall be paid to the sales agent at its office in Birmingham, Ala., on or before the 20th day of each calendar month, for all coal shipped by the operator during the' next preceding calendar month, and shall be based on a ton of 2,000 pounds according to the operator's invoices therefor to the purchasers; said invoices shall be according to railroad scale weights of such coal. Should the operator itself or through any agent other than the sales agent sell any such coal produced by or for it direct to purchasers, the operator agrees to pay the sales agent a commission of 5 cents per toñ for all coal so sold by or for it, as and at the time the commissions above mentioned are payable hereunder. If the operator should not be able to collect for any coal sold hereunder, no selling commissions shall be payable to the sales agent on the coal not collected for, and in case such commission has been paid prior to the time it is found impossible to collect for such coal, the amount of commission paid on same shall be refunded by the sales agent to the operator, or, if the operator elects, may be deducted from any amount then. or subsequently due the sales'agent.

"Third. If at the operator's request any sales of such coal are from time to time invoiced and collections therefor made by the sales agent, the sales agent agrees to pay to the operator at its office in Alabama, on or before the 15th and 30th day of each calendar month, the actual amount of such collections made during the period from the date of such preceding settlement to the date of such settlement, less the sales agent's commission, and the extra charge

to be paid by the operator to the sales agent for such additional service shall be 2 cents per ton.

"Fourth. Upon the date hereof the operator shall furnish the sales agent with a schedule of minimum sales prices for each grade of coal so produced by or for the operator, and the sales agent agrees that it will not sell any such coal at prices less than specified in said schedule without the written consent of the operator. Any changes desired to be made by the operator in the minimum prices specified in said schedule shall be binding upon the sales agent forthwith upon receipt of notice from the operator of such change specifying grade of coal affected and the minimum price thereof, provided, however, that spot sales made by the sales agent's salesmen on the road before such change is communicated to them shall not be affected thereby.

"Fifth. All contracts for sales of coal hereunder shall be made for the account and at the risk of the operator, and no contract shall be binding on the operator until accepted or approved by the operator.

"Sixth. The operator shall at all reasonable times have access to the sales agent's records and books of account for the purpose of checking and verifying the business done by the sales agent hereunder. The sales agent shall at all reasonable times have access to the operator's records and books of account for the purpose of checking and verifying weights of such coal and the operator's invoices thereof with reference to the amount of commission due the sales agent hereunder from time to time.

"Seventh. The sales agent agrees to use its best efforts to sell the operator's entire output of such coal at not less than the minimum prices fixed as herein provided.

"Eighth. This agreement shall continue in effect for one year from the date hereof and thereafter until terminated by either party hereto by written notice to the other party 60 days prior to the effective date of such termination. In the event of any such termination, however, the operator agrees to complete deliveries of all unfilled orders and contracts sold and negotiated hereunder by the sales agent, and to pay to the sales agent, as and when herein provided said commission of 5 cents per ton of 2,000 pounds on all coal included in such deliveries.

"Ninth. Any notice required or permitted to be given hereunder may be given by registered mail, addressed, postage prepaid, and mailed by either party to the other, at its principal business office, and the date of mailing shall be considered the date of giving any such notice.

"Tenth. This agreement shall not be assigned by either party without the written consent of the other party.

"In witness whereof the parties have caused this agreement to be signed in duplicate by their duly authorized officials, this 31st day of January, 1919. Alabama Fuel & Iron Company, Operator, by Chas. F. De Barkelaben, Vice President. Adams, Rowe & Norman, Inc., Sales Agent, by W. C. Adams, President."

The charges refused to defendant and made the basis of assignments 13, 14, 15, 17, and 18 are as follows:

"(a) If you are reasonably satisfied from the evidence that the Central of Georgia Railway Company and its subsidiary companies refused and declined to make the contracts in question in this suit through Adams, Rowe & Norman, and declined to make such contracts unless they were made direct with the Alabama Fuel & Iron Company, and did make such contracts direct with the defendant, then I charge you that plaintiff cannot recover commissions on such contracts.

"(e) If you are reasonably satisfied from the evidence that Central of Georgia Railway Company did not, in the making of its contract and the contracts of its subsidiary companies, deal direct with Adams, Rowe & Norman, but insisted on dealing direct with the defendant in the final closing of said contracts, and refused to deal with Adams, Rowe & Norman, then I charge you that plaintiffs cannot recover.

"(b) If you are reasonably satisfied from the evidence that the Central of Georgia Railway Company and its subsidiary companies refused and declined to make the contracts in question in this suit through Adams, Rowe & Norman, and declined to make such contracts unless they were made direct with the Alabama Fuel & Iron Company, then I charge you that plaintiff cannot recover commissions on such contracts, though you may believe from the evidence that Adams, Rowe & Norman took part in or assisted in preliminary negotiations in an effort to secure the making of such contracts.

"C. I charge you that, in order for plaintiffs to be entitled to commissions on coal delivered by defendant after the termination of the agreement between them and defendant, such coal must have been sold by plaintiffs, and in order for it to have been sold by plaintiffs an agreement of sale must have been reached between the buyer and plaintiffs, acting for the defendant, under which the quantity of coal sold and price thereof must have been fixed.

"D. A sale of coal within the meaning of the contract between plaintiff and defendant would not be made until an agreement had been reached with the buyer, which fixed the quantity of the coal sold and the price to be paid for it."

Assignments 30, 31, and 32 are as follows:

"(30) The court erred in sustaining plaintiffs' objections to the following question asked witness Adams: 'Q. Do you contend that it was by your efforts alone that the Central of Georgia Railway Company made these contracts?'

"(31) The court erred in sustaining plaintiffs' objections to the following question asked witness Adams: 'Q. Isn't it a fact that it was not by your effort alone that these contracts were made?'

"(32) The court erred in sustaining plaintiffs' objections to the following question asked witness Adams: 'Q. Don't you know that the Central of Georgia Railway Company, as a matter of course, each year buys its coal from the Alabama Fuel & Iron Company?'"

Percy, Benners & Burr, of Birmingham, for appellant.

The agency contract is unambiguous. Under its terms, after expiration, plaintiffs were entitled to commissions only on shipments of coal made by defendant where the contracts were concluded by plaintiffs. Being

unambiguous, construction of the contract as applied to the facts of the case was for the court. Foley v. Felrath, 98 Ala. 176, 13 So. 485, 39 Am. St. Rep. 39; McFadden v. Henderson, 128 Ala. 221, 29 So. 640; Hardaway v. Bradley, 163 Ala. 596, 51 So. 21; Drennen v. Smith, 115 Ala. 396, 22 So. 442. The words "sold and negotiated," as used in paragraph 8 of the contract, mean that plaintiffs had procured a buyer who had bound himself to take defendant's coal, all of the essentials of the contract, price, quantity, and quality, having been settled so far as the buyer was concerned. If any of these subjects remained for further negotiation, the buyer was not bound, and plaintiffs could not be said to have sold any coal. Hale v. Kumler (C. C. A.) 85 F. 161; Washington Ice Co. v. Webster, 62 Me. 341, 16 Am. Rep. 468; First Nat. Bank v. Hall, 101 U. S. 43, 25 L. Ed. 822; Martin v. Fuel Co. (C. C.) 22 F. 596; Krum v. Chamberlain, 57 Neb. 220, 77 N. W. 665. It is not sufficient that plaintiffs' efforts may "have contributed towards the making of the contract which was not concluded by them. Handley v. Shaffer, 177 Ala. 653, 59 So. 286; Mabry v. Bailey & Howard, 5 Ala. App. 383, 59 So. 323; Illingsworth v. Slosson, 19 Ill. App. 614; Hinds v. Henry, 36 N. J. Law, 332; Ormsby v. Graham, 123 Iowa, 202, 98 N. W. 729; Pittsburgh R. Co. v. Knox, 177 Ind. 344,.98 N. E. 298; Gallup v. Sterling, 22 Misc. Rep. 672, 49 N. Y. S. 942; Fagan v. Lentz, 156 Cal. 681, 105 P. 951, 20 Ann. Cas. 221; Forthman v. Deters, 206 Ill. 159, 69 N. E. 100, 99 Am. St. Rep. 145; Memory v. Niepert, 131 Ill. 623, 23 N. E. 432; Radebaugh v. Scanlan, 41 Ind. App. 109, 82 N. E. 544; Combes v. Adams, 150 N. C. 64, 63 S. E. 186; Goodwin v. Sieman, 106 Minn. 368, 118 N. W. 1009.

Bradley, Baldwin, All & White, James D. Rucker, and William Douglas Arant, all of Birmingham, for appellees.

The words "sold and negotiated," as used in the agency contract, do not require the sales agent to consummate a sale in all details in order to earn the commission. Birmingham L. & L. Co. v. Thompson, 86 Ala. 146, 5 So. 473; Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882, 38 Am. St. Rep. 683. Such words, as employed in the contract, are used synonymously. Sayre v. Wilson, 85 Ala. 151, 5 So. 157; Kock v. Emmerling, 22 How. 69, 16 L. Ed. 292; Hinds v. Henry, 36 N. J. Law, 328, A broker has earned his commission if he has been the procuring cause of a sale by his principal to the purchaser. Author, ubi supra; Glass v. Smith, 21 Ala. App. 325, 109 So. 170; Id., 215 Ala. 52, 109 So. 171.

This case having been submitted under Supreme Court rule 46, the opinion of the court was delivered by Mr. Justice GARDNER:

Suit by appellee against appellant for recovery of commission alleged to be due under written contract, whereby appellee became the exclusive sales agent of appellant for the entire output of its coal mines. Commissions sued for are on sales of coal by appellant to the Central of Georgia Railway Company (hereinafter designated the Central Company) and three of its subsidiaries. There was verdict and judgment for plaintiff, from which the defendant has prosecuted this appeal.

The question here most strenuously argued, and the one of prime importance on this appeal, relates to the action of the court in refusing the affirmative charge requested by defendant.

The contract was entered into in January, 1919, and by its terms was to continue in effect for "one year from date hereof and thereafter until terminated by either party hereto by written notice to the other party 60 days prior to the effective date of such termination." Appellant [for convenience referred to as the Alabama Fuel Company] gave written notice of the termination of said contract on July 6, 1925, the effective date of termination being September 6th thereafter. In paragraph 8 of the contract is the following provision, which constitutes the turning point of this litigation:

"In the event of any such termination, however, the operator agrees to complete deliveries of all unfilled orders and contracts sold and negotiated hereunder by the. sales agent, and to pay to the sales agent, as and when herein provided, said commission of 5 cents per ton of 2.000 pounds on all coal included in such deliveries."

The manner of payment was as follows:

"All commissions due hereunder shall be paid to the sales agent at its office in Birmingham, Ala., on or before the 20th day of each calendar month, for all coal shipped by the operator during the next preceding calendar. month, and shall be based on a ton of 2,000 pounds according to the operator's invoices therefor to the purchaser."

Exhibit to the contract contained a list of then existing contracts for coal, with the name of the purchaser and quantity purchased—the Central Company being among the number—and the contract provided that the operator should complete deliveries under these contracts and commission paid the sales agent of 3 cents per ton thereon. It was further stipulated:

"On any renewal of such contracts and on all other contracts or sales, the operator agrees to pay the sales agent a commission of 5 cents per ton. * * * Should the operator itself or through any agent other than the sales agent sell any such coal produced by or for it direct to purchasers, the operator agrees to pay the sales agent a commission of 5 cents per ton for all coal so sold by or for it, as and at the time the commissions above mentioned are payable hereunder."

By this latter language the agent is more definitely secured the exclusive agency for

the sale of. the operator's coal, as was expressed in more general terms in the first paragraph of the contract. All contracts for the sale of coal were subject to the acceptance or approval of the operator.

The Central Company continued after the execution of this agency contract the purchase of coal from the Alabama Fuel Company under yearly contracts, and the tonnage used had been materially increased. The last contract, prior to this suit, of the Central Company expired July 31, 1925. It was a large customer of the Fuel Company, and its contract one of much importance, and much effort was made looking to a renewal of this contract from year to year.

There is evidence tending to show that these efforts were not relaxed by reason of the fact that the Fuel Company mines were located on lands owned by the Central Company and operated under long term lease, wherein the Central Company was given the option to purchase two-thirds of the output of the mines. Notwithstanding this, there was the question of price to be fixed and the Central Company was under no obligation to buy.

Those active in the transactions which constitute the subject-matter of this litigation were W. C. Adams, on the part of plaintiff, and C. F. De Bardelaben on the part of defendant, dealing with J. L. Bennett, purchasing agent, and A. L. Downs, president of the Central Company.

It was customary for Adams and De Bardelaben to go to Savannah to confer with these officials of the Central Company each year with reference to a renewal of the contract, and on each occasion it appears agreement as to the price was reached.

Some few months prior to the expiration of the Central Company's contract (July 31. 1925) Adams and De Bardelaben conferred from time to time in reference to its renewal, and in June concluded the time had arrived for a personal conference with the officials of the Central Company. De Bardelaben sent Adams to Savannah for that purpose, and engagement for a personal interview was made by Adams with Bennett by wire. Adams reached Savannah the morning of June 18th, and talked to several subordinate officials during the day. He called on Bennett the morning of the 19th, and discussed a renewal of the contract, stressing the price De Bardelaben had given him as the minimum—which was the same price as the year previous—and also insisted that the Central Company could use more tonnage. Bennett urged lower prices and would not close the contract. Interview was obtained by Adams with Downs, the president, at which time much the same argument was presented. No conclusion was reached. Adams testifies that Downs told him they were going to trade with him, of course— "there wasn't much between them"—they

would reach a conclusion in the next ten days or two weeks, and that Bennett would come over to Birmingham and "wind it up." Upon his return to Birmingham, Adams reported to De Bardelaben the substance of these interviews, advised him to hold firm on prices, and that he thought also the Central Company would buy additional tonnage. That De Bardelaben congratulated him on the manner in which he had handled the situation, and agreed not to lower the price. A few days thereafter, De Bardelaben inquired of Adams if he had heard anything from either Mr. Bennett or Mr. Downs, and on June 29th, De Bardelaben called Adams over the 'phone, informing him he had a telegram from Bennett requesting a personal interview, and, after something being said about not lowering prices, De Bardelaben suggested to Adams that he be convenient for call about lunch hour. The next morning Adams and De Bardelaben again conferred in reference to this matter and Bennett's pending visit. Upon Bennett's arrival he was met by De Bardelaben; they lunched together, and the matter of price agreed upon, with little or no discussion—the price being the same as quoted by Adams and as the previous year. Bennett, in substance, merely stated to De Bardelaben that Downs had instructed, if De Bardelaben would say the price quoted was as low as he could consistently quote, to close the matter. Adams testified that, after lunch hour, he found a call from De Bardelaben, went to his office, and mutual congratulations were passed. This was June 30th, and in a few minutes, upon Adams' return to his office, De Bardelaben and Bennett came by and the fact that the matter was closed at prices previously quoted was discussed, and as to the additional tonnage Bennett stated he would determine that later.

Two or three days thereafter Adams asked De Bardelaben if he wanted him to prepare the written contract, or did he prefer the form he sent for him to handle the matter with Bennett. De Bardelaben requested the blank form, kept by Adams for such purpose, be sent to his office, which was done. This was July 3rd or 4th, and on the 17th De Bardelaben called Adams, informing him that Bennett had definitely closed for certain quantities, representing some increase in tonnage, and at the agreed price. The written contracts were soon thereafter executed in formal manner.

Commissions were duly paid plaintiff on deliveries under these contracts to September 6th, the date of termination of the agency contract, and plaintiff did not learn until the month of October that commissions were not to continue after that date on deliveries under these contracts.

It appears that the general method in renewal of these contracts with the Central Company was to agree on the price—that was the principal thing—and later figure on

the tonnage, as that was a matter as to the requirements of the road. Upon the occasion of Bennett's luncheon interview with De Bardelaben, the price only was agreed, the tonnage to be subsequently determined; this in accordance with the customary manner of closing these agreements with the Central Company for renewal.

The foregoing but briefly outlines the salient features of the case, with particular reference to the testimony offered by the plaintiff. There are some contradictions, but as these are upon matters not of controlling importance, they may be passed by without further notice.

Defendant lays much stress upon the fact that no agreement was reached by Adams on his visit to Savannah—that he did not close the contract—and upon the further fact that Bennett in his interview with De Bardelaben stated that Mr. Downs had instructed that he make no contract with Adams, but deal directly with De Bardelaben. None of the parties, however, informed Adams of any aversion to dealing with him, and the evidence tends to show that he remained in entire ignorance thereof; the evidence further tending to show that Bennett's statement to De Bardelaben was the first intimation the latter had in that regard.

Defendant insists that as to recovery of commissions on deliveries subsequent to the termination of the agency contract, it must appear that the coal was "sold and negotiated" by the plaintiff, in the sense that a completed contract of sale was made, at least to the extent that it would be legally binding upon the purchaser, and that to such end the agreement must have been reached with the purchaser not only as to the price, but quantity and quality of coal to be delivered. Some of the authorities relied upon by defendant relate to transactions between purchaser and seller or other than agency contracts (among them Krum v. Chamberlain, 57 Neb. 220, 77 N. W. 665; Martin v. Northwestern Fuel Co. [C. C.] 22 F. 596; Nat. Bank v. Hall, 101 U. S. 43, 25 L. Ed. 822; Washington Ice Co. v. Webster, 62 Me. 341, 16 Am. Rep. 462; Radebaugh v. Scanlan, 41 Ind. App. 109, 82 N. E. 544; Memory v. Niepert, 131 Ill. 623, 23 N. E. 432; Forthmam v. Deters, 206 Ill. 159, 69 N. E. 100, 99 Am. St. Rep. 145; Fagan v. Lentz, 156 Cal. 681, 105 P. 951, 20 Ann. Cas. 221); other authorities concern agency contracts construed as requiring completed sales or transactions as conditions precedent to payment of commission to the agent (Hale v. Kumler [C. C. A.] 85 F. 161; Illingsworth v. Slosaon, 19 Ill. App. 612; Hinds v. Henry, 36 N. J. Law, 328; Ormsby v. Graham, 123 Iowa, 202, 98 N. W. 724).

Of this latter class of authorities is the comparatively recent case from this court of Malone v. Dillard, 212 Ala. 361, 102 So. 705. These authorities but demonstrate of course that the question is one to be determined upon consideration of the particular contract to be construed in the light of all the surrounding circumstances, to gather the intention of the parties thereto.

Plaintiff urges (and the view was evidently accepted by the trial court) that the law as applicable to the instant contract is that applied in ordinary contracts between real estate brokers and the owner, as expressed in the headnote to Birmingham Land & Loan Co. v. Thompson, 86 Ala. 146, 5 So. 473:

"A broker, or real estate agent, employed to effect a sale of land on specified terms, becomes entitled to his commissions, or agreed compensation, when he procures a purchaser who is able, ready and willing to buy on the terms specified, and the vendor accepts him, although the purchaser afterwards declines to complete the contract, on account of a defect of title." And, "a broker who is employed to sell property on commission, earns his compensation, when he has been the efficient agent in procuring a satisfactory purchaser who is able, ready, and willing to buy the property, on the terms fixed by the owner." Sayre v. Wilson, 86 Ala. 151, 5 So. 157; Malone v. Dillard, supra; Culver.v. Gambill Realty Co., 214 Ala. 84, 107 So. 914. "What amounts to the procurement of a purchaser is a question of fact, and it is enough that the efforts of the broker, acting upon the purchaser, are the efficient cause of his offer to purchase." Handley v. Shaffer, 117 Ala. 636, 59 So. 286.

[1-3] We are persuaded the foregoing principle is applicable to the agency contract here considered. So concluding, we are of the further opinion that the question, whether or not plaintiff was the efficient or procuring cause of the sale to the Central Company upon its renewal contracts, was properly left to the determination of the jury. Adams had devoted much effort to this renewal at the price given him by De Bardelaben, and made use in discussions with the Central Company's officials of all arguments at his command to maintain the position and uphold the price. True, he failed to close the contract, but Bennett's visit and personal interview with De Bardelaben a short time thereafter in Birmingham can but be closely associated with Adams' visit to Savannah, and, indeed, may be inferred as a culmination thereof—to which added weight is given when considered in connection with the fact that at such interview but few words were passed as to the price, and, indeed, it was left entirely with De Bardelaben; all of which occurred prior to any notice of termination of the agency contract. We think, also, that the jury could find that the coal had been sold to the Central Company within the meaning of this contract, when the price agreement had been reached. Such was the customary manner of handling these transactions with particular customer, for the matter of tonnage was usually figured later and rested on the requirements of the road. It may be very reasonably inferred also that the Central

Company's officials had reached the conclusion not to further deal with Adams, but with De Bardelaben direct; but no intimation of such intention was given Adams. The latter was given due attention in his interview with them at Savannah, and the fact that they might prefer to deal with De .Bardelaben would not bar plaintiff of the commissions. "It may, and doubtless often does, happen that the purchaser would prefer dealing directly with the owner. So it is held that the agent is entitled to his commission if he .is the procuring cause of negotiations which result in the sale, even though the negotiations are conducted and concluded by the principal in person." Gelatt v. Ridge, 117 Mo. 553, 23 S. W. 882, 38 Am. St. Rep. 683.

We have carefully considered the provisions of paragraph 8 here pertinent in connection with all other provisions of the agency contract and in the light of the argument of counsel. Further discussion would extend this opinion to undue length. We rest content with the statement of our conclusion that the case was a proper one to be submitted to the jury, and there was no error in refusing to the defendant the affirmative charge as requested.

Assignments of error ·13, 14, and 15 relate to the refusal of charges (a), (e), and (b). What we have said in regard to the fact that the Central Company's officials were averse to dealing with Adams, as not here affecting plaintiffs' right of recovery, is sufficient answer to these assignments. The use of the word "make" in these charges renders them also misleading, as the word is susceptible of a meaning unauthorized by the agency contract.

[4] We are of the opinion that the court did not commit error in declining to permit defendant to show that, at some time previous to Adams' visit to Savannah, Mr. Downs had instructed Mr. Bennett not to negotiate the contracts with Adams. The general rule of the law of evidence would exclude such testimony. Gordon v. Clapp, 38 Ala. 357; Brand v. Abbott, 42 Ala. 499. No time limit is fixed in the question. Mr. Downs, in fact, had the concluding words as to these contracts. It is not pretended Adams knew anything of such instruction, and the evidence, under .the circumstances here shown, could not be held admissible under any exception to the hearsay rule permitting circumstantial proof as to a state of mind. 10 R. C. L. 938.

[5] The written contracts for the purchase of coal as finally concluded bore indorsements following signatures to the effect that these contracts had not been made through plaintiffs. The indorsements formed no part of the contract, and our previous discussion of the facts in connection with the agency contract suffices to show that they could have no bearing upon plaintiffs' right of recovery.

The court committed no error in their exclusion.

Our discussion of the agency contract and the evidence as to the customary manner of renewals as to the Central·Company's contracts will suffice to sustain the court in the refusal of charges D and C. Assignments of error 17 and 18 present no reversible error.

[6] The questions to witness Adams (rulings as to which constitute assignments 30, 31, and 32) were argumentative and called for legal conclusions. The court committed no reversible error in sustaining the objections thereto.

We have considered all assignments of error here insisted upon, and, finding no reversible error, the judgment will be affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and BOULDIN, JJ., concur.