## HALE v. KUMLER.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1898.)

No. 513.

1. BROKER'S COMMISSIONS—NONPERFORMANCE OF CONDITION.
   Where the condition upon which a broker is to be entitled to commissions is not fulfilled, but performance has not been prevented by the wrongful conduct of the principal, the latter is entitled, in an action by the broker for compensation, to rely upon the fact of nonperformance.

2. SAME—ABSENCE OF COMPLETED AGREEMENT.
   Where a broker is to become entitled to commissions only upon bringing about a completed agreement between his principal and a third party, he cannot recover upon proof of a preliminary and tentative agreement upon certain elements of a proposed contract, which were afterwards abandoned by the principal.

In Error to the Circuit Court of the United States for the Northern District of Ohio.

85 F.—11

This was an action to recover an agreed compensation under a contract for services rendered as a broker in bringing about a consolidation of two rival street-railway companies. It was not claimed that any actual consolidation of the two companies had ever been brought about, but that after an agreement had been reached between plaintiff in error as the owner or representative of the stock of the Toledo Consolidated Street-Railway Company, and David and James J. Robison, as the owners or representatives of the stock of the Toledo Electric Street-Railway Company, as to the vital terms of a consolidation, a consummation of the arrangement was defeated by the wrongful refusal of the plaintiff in error to further negotiate or to carry out the consolidation by doing the formal acts which were necessary to the conclusion of the matter. There was a verdict and judgment against the plaintiff in error for $18,200, being the full amount, with interest, which would have been earned if an actual consolidation had taken place through the intervention and services of the defendant in error.

The facts necessary to an understanding of the questions upon which the case must turn are these:

The defendant in error, John F. Kumler, was a lawyer, practicing and residing in Toledo, Ohio. He was, when he undertook to bring about a consolidation of the Toledo Consolidated Street-Railway Company with the Toledo Electric Street-Railway Company, the general attorney of the latter company as well as the confidential counsel for the Robisons, who owned or controlled all of its stock. William E. Hale, the plaintiff in error, was a retired capitalist living in Chicago, and owned two-fifths of the entire stock of the Toledo Consolidated Street-Railway Company. For some time there had been suggestions from both sides for a consolidation of the two companies, but they had come to nothing. In this situation Kumler addressed the following letter to Hale:

"Dear Sir: Would you sell your entire street-railway system here for $2,800,000, and turn the property over free from all liens except first mortgage? In thirty days, I am sure I can bring a purchaser to you. If you will not sell, would you consolidate yours with the Robison system on a fair, equitable basis? The suggestions which I have made above are independent of my clients. I have now a flat offer for the Robison system, in cash, over and above their first mortgage indebtedness. If you have either in mind please write me. If not, let the subject pass, and no harm will be done. The times are hard, and if I can take any matter up that will enable me to turn an honest penny I am ready to do it. If sale is made of your property or consolidation is effected, for the former I shall expect $25,000, and for the latter the same sum, but to be divided on the basis of the value of the properties so consolidated."

To this Hale replied as follows:

"Dear Sir: I have your letter of the 4th. I doubt any one's ability to sell our Toledo property at any price we would consider at the present time. Certainly could not consider the price you name. It is better for us to keep it than to think of selling this year or next. As to consolidation, I believe a large saving could be made by operating the two roads together, and, if a feasible plan could be presented, might be inclined to consider it. The terms of such a plan could only be determined by an interview. If you have anything in mind come over here. It is not wise to talk in Toledo. Mr. Ream will be in the East for some weeks, probably until September 1st, but that need not stand in the way, as, if we can agree on any plan, I can submit it to him.

"Yours, truly,                                    W. E. Hale.

"If you have a party who can buy Robisons' road, why not bring him along? We might be able to agree with him easily."

A conference followed, which resulted in the agreement found in Hale's letter to Kumler of August 14, 1894, as follows:

"Dear Sir: My understanding of our talk to-day in reference to commission is as follows: If within sixty days from this date you shall bring about, and actually carry into effect (by the transfer of the stock of each company, as may be agreed upon), a consolidation of the properties of the Toledo Consolidated and the Toledo Electric Street-Railway Companies, I am to pay you such proportion of twenty-five thousand dollars ($25,000) as the percentage allowed the Toledo Consolidated Street-Railway system, in the consolidation, bears to 100 per cent. Or, in case you shall succeed in selling the Toledo Consolidated system of street

railways at a price not yet named, which is satisfactory to me, and the sale is consummated and payment made within sixty days from this date, I am to pay you twenty-five thousand dollars ($25,000) when the final payment is made. In the event that the consolidation is not fully accomplished, or the sale effected, and the money paid within sixty days, I am to be under no obligations whatever to pay anything, and perfectly free to make any other disposition of the property, or none at all, as I deem best."

Kumler endeavored to get some modification of this agreement, as shown by his letter of August 22, 1894, which was as follows:

"Dear Sir: I am in receipt of your letter of August 14th, and also of the 17th inst., and in answer to the former would say that I think your proposition to pay a commission restricts me a little too much. Could you not prepare another proposition, and in it provide that if the said Kumler finds a purchaser for your street-railway property at the price at which you will sell, and the negotiation is reduced to writing, fixing the terms of sale, that under those circumstances the commission ought to fairly be earned. Next, as to the consolidation of the two properties. I think the contract ought to provide, as between yourselves and myself, that if a contract for the consolidation of the two properties is entered into by which a consolidation of the street-railway properties is effected, that then and under those circumstances the commission ought to be fairly earned, you folks to pay a proportionate share of the $25,000 as the value of your proportionate share of the whole consolidation. You doubtless will understand what I mean in what I have suggested above, and which I think to be entirely fair between all parties. Mr. Robison expects to leave Toledo for Mackinac Island next Tuesday. His wife will precede him to-morrow, and, as he is one of the busiest men in the world, he doubtless will not tarry very long at the island, say not longer than three or four days; at which point, should it suit you to be, he will be glad to see you and talk your business affairs over fully. Will the time fixed be agreeable to you? Matters are quite uncertain with Mr. Robison, as he has a sister-in-law very sick at his house, and the condition of Mrs. Robison is such that she is obliged to go somewhere to obtain relief from hay fever. Be kind enough to let me hear from you by return mail, and oblige."

To this Hale replied:

"Chicago, August 23, 1894.

"Mr. John F. Kumler, Toledo, Ohio—Dear Sir: I have your letter of the 22d. I prepared my proposition in regard to a commission with a view of getting through with the matter at some definite time, and should not care to vary it so as to make it at all indefinite. You asked for thirty days and I gave you sixty. In all cases of this kind I am careful in making an agreement to have a definite and fixed time for its termination, so that by no possibility can any misunderstanding arise. I should not be willing to make any preliminary contract either for the sale or consolidation of our Toledo property. When it is done it must be done, and that must be the end of it. You will therefore see that I could not change the terms of my proposition on the basis of reducing to writing a preliminary agreement. I am not willing to put anything in writing in regard to the matter until you have a party who is ready to close. I want to make the arrangement perfectly fair between us, and want to fix it so that you can earn the commission, but I also want to be sure that there is no misunderstanding at the end."

The contract set out in Hale's letter of August 14, 1894, was declared upon as the contract under which Kumler had earned the compensation therein stipulated for.

There was evidence tending to show:

(1) That Kumler's relation to the Toledo Electric Street-Railway Company and to the Robisons was perfectly well known to Hale, and also that the Robisons knew of the relation he assumed to Hale under the contract here involved.

(2) That Hale and the Robisons, through the intervention of Kumler, were brought together on the island of Mackinac for the purpose of conferring upon the terms of a consolidation of the two properties, and that the conferences and negotiations there had resulted in an oral agreement that a consolidation should be brought about upon the basis of the gross earnings of each company in 1893,

including the earnings of the electric lighting department of the Toledo Electric Street-Railway Company for the year beginning July 1, 1893, and ending July 1, 1894.

(3) It was further there agreed that the books of each company for the periods mentioned should be examined by an expert bookkeeper, appointed by the opposite party, for the purpose of fixing the precise percentage of the stock of the new or consolidated company to be alloted to each of the old companies.

(4) The matter of the disposition of the large indebtedness of each company was not referred to in the Mackinac conference, nor was any other detail of such consolidation arranged; such as the amount of the capital stock of the new company, its name, or officers. All these matters seem to have been regarded as details of comparative easy arrangement, if once the valuation allowed each company should be satisfactorily adjusted.

(5) In accordance with this arrangement Hale appointed an expert to examine the books of the Toledo Electric Street-Railway Company, and the Robisons appointed another to make a like examination of the books of the Toledo Consolidated Street-Railway Company. The examinations directed were made, and each expert reported the result. The report of the gross earnings of the Toledo Electric Street-Railway Company is not in evidence, but it was shown that the percentage thus reached would divide the stock of the new company as follows: To the Toledo Electric Street-Railway Company, 34.41 per cent.; to the Toledo Consolidated Street-Railway Company, 65.59 per cent.

(6) This result was unsatisfactory to Hale and his associates. This was expressed in a letter to Kumler of September 18, 1894, as follows:

"Dear Sir: I have seen Mr. Ream since I came on here, and discussed with him Mr. Holbrook's report. He is not altogether satisfied with it. By it we learn that he was not permitted to check up the receipts from any original sources, and that the books are not kept in the careful and methodical manner a bookkeeper always approves. Mr. Ream desires a more careful examination, and for a longer period, covering all the time from January 1, 1893, down to date of examination. The amount reported as received from the sale of tickets seems too large a proportion of total receipts, and tends to cause the conclusion that a mistake has been made in footings or otherwise. Our ticket sales are only about 15 per cent. of the total, while these are 30. It does not seem as though the difference in price could possibly make so large a difference. I wish, therefore, you would see if you can arrange for this examination, and, if so, I will have Mr. Holbrook make another visit to Toledo. I expect to be here with my daughter this week and next. I send this to my office to be written out and copied in my letter book. It will be forwarded to you by my secretary.

"Yours, truly,                                    W. E. Hale, Per Piercy."

The Mr. Ream referred to in the above letter was N. B. Ream, who owned two-fifths of the entire stock of the Toledo Consolidated Street-Railway Company, and it was contended by Hale that from the beginning Kumler knew that any propositions acceptable to Hale must be submitted to Ream before final acceptance. This was denied by Kumler, and this issue must be regarded now as settled against the contention of Hale. The Robisons refused to assent to an examination of their books for 1894. The further correspondence between Hale and Kumler related chiefly to the claim of Kumler that he had earned his compensation and a denial of the claim by Hale. The grounds taken by each were much the same as those upon which this case turned below. Hale persisted in his refusal to accept the gross earnings of 1893 as a basis of consolidation, and fell back to a proposition to trade on the basis of 75 per cent. to his company and 25 per cent. to the Robison company. This being unsatisfactory to the Robisons, the whole matter fell through, and this suit was brought.

Smith & Baker (Rufus H. Baker, Barton Smith, and John P. Wilson, of counsel), for plaintiff in error.

Hurd, Brumback & Thatcher (Charles A. Thatcher, Orville S. Brumback, and J. Kent Hamilton, of counsel), for defendant in error.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

At the conclusion of all the evidence the plaintiff in error moved the court to instruct the jury to find for the defendant. This was denied, and is the principal error now assigned. If the issues of fact submitted to the jury were controlling, then it would have been error to instruct for the defendant, unless such an instruction was warranted, although there should be a finding upon those issues in favor of the defendant.

The view taken of the contract upon which this action was brought, and of the bearing of the issues of fact submitted, is indicated by the closing paragraph of the charge of the learned trial judge, which was in these words:

"To sum up, if you believe from the evidence that the defendant and the Robisons agreed to consolidate the properties on the basis of the gross earnings of the two companies, to be ascertained by an agreed examination of the books, respectively; that such an examination took place, and the gross earnings were thereby ascertained, that the plaintiff, Kumler, was ready and willing at all times to carry out his part of the bargain by negotiating for and obtaining the consent of the parties to any subsequent steps that were necessary to effectuate the consolidation agreed upon; and that the defendant, Hale, refused to accept for himself and his associates that basis of agreement, and to proceed with the business of arranging for a consolidation on that basis,—the plaintiff is entitled to recover such proportion of $25,000 as the percentage allowed the Toledo Consolidated Street-Railway Company bears to 100 per cent."

The contract under which Kumler sued contains none of the terms or conditions upon which Hale would consent to a consolidation. It follows from this that it was impossible for Kumler to earn the stipulated compensation unless Kumler could obtain from the Toledo Electric Street-Railway Company such terms and conditions as should be in all respects satisfactory to Hale. It was therefore not only necessary that he should satisfy his own company and original principal with the terms obtainable from Hale, but that he should bring Hale into an agreement with terms satisfactory to the Toledo Electric Street-Railway Company. The case is therefore one not governed by that class of cases holding that a real-estate broker employed to sell property upon terms stated by the seller in advance has complied with his agreement and earned his commission when he produces a purchaser able and willing to purchase at the price and upon the terms named in the contract of employment, although the contract fails of consummation for any reason. Kock v. Emmerling, 22 How. 69; Holden v. Starks, 159 Mass. 503, 34 N. E. 1069; Middleton v. Thompson, 163 Pa. St. 112, 29 Atl. 796; Sibbald v. Iron Co., 83 N. Y. 378; Fraser v. Wyckoff, 63 N. Y. 445; Sayre v. Wilson, 86 Ala. 151, 5 South. 157; Smith v. Mayfield, 60 Ill. App. 266; Prickett v. Badger, 1 C. B. (N. S.) 296.

These cases, and many others which might be cited, proceed upon the ground that the duty of the broker is finished when he has produced a purchaser able and willing to comply with the terms upon

which the broker was authorized to offer the property for sale, and that the principal, when sued by his agent for the full commission stipulated, cannot defeat the action by availing himself of the nonperformance of any actual sale when he himself has occasioned its nonperformance.

Kock v. Emmerling, cited above, was a case where the broker was employed to sell a plantation owned by the principal at the price of $250,000. The agent produced a purchaser willing to buy at that price, and the terms of sale were agreed upon, but a sale was defeated by a change of mind upon the part of the seller. The broker was held to have earned his compensation as if a sale had been consummated, Mr. Justice McLean saying:

"Where the vendor is satisfied with the terms, made by himself, through the broker, to the purchaser, and no solid objection can be stated, in any form, to the contract, it would seem to be clear that the commission of the agent was due, and ought to be paid. It would be a novel principle if the vendor might capriciously defeat his own contract with his agent by refusing to pay him when he had done all that he was bound to do. The agent might well undertake to procure the purchaser; but, this being done, his labor and expense could not avail him, as he could not coerce a willingness to pay the commission which the vendor had agreed to pay. Such a state of things could only arise from an express understanding that the vendor was to pay nothing, unless he should choose to make the sale."

So the ordinary contract between a principal and his broker, by which the former agrees to pay a commission if a sale shall be made on terms and conditions set out in the contract, is always subject to revocation before a sale is actually made or a purchaser produced ready and willing to take the property upon the stipulated terms. If revoked before any services have been rendered or expense incurred, the broker can recover nothing, though, if revoked after the agent has rendered services or incurred expense, he is entitled to reimbursement, unless the terms of the agreement imply otherwise.

Thus in Prickett v. Badger, 1 C. B. (N. S.) 296, the case was this: The defendant employed the plaintiff to sell a parcel of land at a stipulated price, and was to receive, in case he made a sale, a commission on the price. He found a purchaser at the price named, but the principal refused to sell because he was unable to make title. The agent was held entitled to recover a reasonable compensation for his expense and services, which under the circumstances was held, as matter of law, to be the entire amount of the commission agreed for. But in Simpson v. Lamb, 17 C. B. 603, an agent was employed to sell an advowson at a stipulated price, and was to receive a commission of 5 per cent. upon the price. The principal afterwards sold the living himself without communication with his agent, who brought an action for a wrongful revocation of the authority. It was held, in the absence of evidence of expense or liability incurred, that the agent could recover nothing. Jervis, C. J., saying:

"There can be no doubt that the authority was revocable; but that does not carry with it an absolute right on the part of the principal to revoke without reinstating the agent when his position has been altered. That will depend upon the terms of the original employment. I take it to be admitted that it is not competent to a principal to revoke the authority of an agent, without paying for labor and expense incurred by him in the course of the employment. The right of the agent to be reimbursed depends upon the terms

of the agreement. A general employment may carry with it a power of revocation or payment only of a compensation for what may have been done under it; but there may also be a qualified employment, under which no judgment shall be demandable if countermanded. In the present case I think the evidence showed that the employment was of that qualified character, like the case of the house agent, or the ship broker, the plaintiff undertaking the business upon an understanding that he was to have nothing if he did not sell the advowson, taking the chances of the large remuneration he would have received if he had succeeded in obtaining a purchaser."

Williams, J., said:

"Looking, however, at the peculiar nature of the employment here, and the scale of remuneration in the event of a negotiation terminating successfully, I think it clearly was incident to the employment that the plaintiffs' authority might be revoked at pleasure by the defendant, unless something had been done upon it, or some expense had been incurred by the plaintiffs in furtherance of it."

But the contract here involved is unlike any of those referred to in the cases we have cited. It not only contains no authority to Kumler to sell or consolidate upon terms stated, but makes any compensation contingent upon an actual consolidation, and payable only when such consolidation should be consummated. The contingent character of the compensation is so evident as to hardly need discussion. It appears in three distinct aspects: (1) Hale was not to pay any definite sum, but that proportion of $25,000 which the percentage allowed the Toledo Consolidated Street-Railway Company should bear to the percentage allowed that corporation in the capital of the consolidated company. Thus his compensation from Hale was to be measured by the valuation at which the property of the Toledo Consolidated Street-Railway Company was received into the consolidation. (2) The affirmative part of the contract was that, if within 60 days an actual consolidation should be carried into effect, the stipulated compensation was earned. (3) To emphasize the necessity of an accomplished consolidation, it is provided that, if the consolidation "is not fully accomplished," Hale is to be under no obligation to pay anything.

Nothing short of an actual accomplished consolidation would entitle Kumler to any compensation, and that it was so understood by both parties is shown by Kumler's letter of August 22, 1894, to Hale, in which he insisted that the proposition to pay him a commission restricted him too narrowly. In that letter he insisted that:

"The contract ought to provide, as between yourself and myself, that if a contract for the consolidation of the two properties is entered into by which a consolidation of the street-railway properties is effected, that then and under those circumstances the commission ought to be fairly earned."

To this Hale replied, refusing any modification, saying:

"I should not be willing to make any preliminary contract either for the sale or consolidation of our Toledo property. When it is done it must be done, and that must be the end of it. You will therefore see that I could not change the terms of my proposition on the basis of reducing to writing a preliminary agreement. * * * I want to make the arrangement perfectly fair between us, and want to fix it so that you can earn the commission, but I also want to be sure that there is no misunderstanding at the end."

That the contract required a legal consolidation of the two companies is also very clear,—a consolidation in fact, and not a mere illegal

agreement, which could not be lawfully effected. Both companies were corporations under the law of Ohio. Their properties were wholly within that state, and we are clearly of opinion that this contract contemplated nothing less than a consolidation lawful under the law of Ohio. The mode in which such a consolidation might be brought about is defined by section 2505a, 88 Ohio Laws, p. 493, and section 2505b, 89 Ohio Laws, pp. 406, 407. These provisions were thus summarized by the trial judge:

"(1) The directors of the several companies must enter into a joint agreement under the corporate seal of each company for consolidation, providing (a) the terms and conditions; (b) the mode of carrying the same into effect; (c) the name of the new company; (d) the number of directors and the other officers thereof and their places of residence; (e) the amount of the capital stock of the new company agreed upon; (f) the number of shares of capital stock, and the amount of each share; (g) the manner of converting the capital stock of each into the new company; (h) with such other details as they may deem necessary to effect the consolidation and new organization of the company.

"(2) This agreement must be submitted to the stockholders of each of the companies, at a meeting thereof, called separately, due notice of which must be given to each of the persons appearing as stockholders on the books of the company, unless this is waived by all the stockholders being present in person or by proxy. This agreement of the directors must be considered and voted upon by ballot, ballots to be cast in person or by proxy, and, if adopted by two-thirds of all the votes cast at the meeting, may then be certified to the secretary of state.

"(3) When all this is done, each stockholder not assenting must be paid the highest market value of his stock at any time within six months next preceding the consolidation, previous to the consolidation, so that any valid contract for consolidation, not assented to by every stockholder in the manner provided by statute, must, as a condition of its existence as a contract, provide for the payment to dissenting stockholders."

Now, if we assume, as we must, that Hale represented all the stock of his company, and could, through that control, have caused all the formal corporate steps to be taken when a satisfactory preliminary agreement had been reached by conference with the owners and representatives of the rival company, we find that only the first step was agreed upon as a result of such conference. That step was an agreement upon the percentage to be allowed the respective companies in the capital of the consolidated company. None of the numerous and important details of such a consolidation were touched upon at the Mackinac conference. That the comparative valuation of the two properties was the most vital of the subjects upon which an agreement was essential, before the matter was in shape for separate corporate action, is clear. But, when such valuation was fixed, it became equally essential that there should be an agreement as to the name of the new company, the amount of the capital stock, the adjustment of the mortgage and general debt of each company, the number of directors and other officers, etc. Assuming, as we do, that at Mackinac an agreement was reached that a consolidation of the two companies should be brought about upon the basis of the gross earnings of each company, to be ascertained by an examination of their books for an agreed period and by experts selected by Hale and the Robisons, and assuming, also, as we must, that this examination was made and the result reported, we reach the inquiry whether, if either

party was dissatisfied with that result and unwilling to adhere to the basis thus ascertained, either could at that stage retract and refuse to go further with the negotiation, without subjecting himself to an action for a breach of contract, or rendering himself liable to an equitable proceeding for a specific performance? If we treat the Mackinac negotiators as principals, it is evident that no complete contract was there settled, and neither would have been liable to the other for a breach of the agreement then reached. It is also most obvious that what was then agreed upon constituted only a provisional agreement, and was necessarily subject to an agreement in respect of all the other terms and conditions essential to a complete contract. The step there taken was in its nature but a step taken in the process of negotiation, and was subject to retraction or reconsideration, while other particulars to a complete contract remained for settlement. This most obvious proposition was thus stated by Lord Blackburn in Rossiter v. Miller, 3 App. Cas. 1151:

"So long as they are only in negotiation, either party may retract; and though the parties may have agreed on all the cardinal points of the intended contract, yet, if particulars essential to the agreement still remain to be settled afterwards, there is no contract. The parties, in such case, are still only in negotiation."

Now, if an agreement as to the basis of a consolidation was subject to retraction and reconsideration at any time before an agreement as to all the other terms and conditions, was there anything in Kumler's contract with Hale which would make the latter liable to the former for the agreed compensation, if Hale, in the exercise of his liberty as owner, should change his mind as to the desirability of a consolidation upon the provisional basis reached at Mackinac? The learned trial judge seems to have been of opinion that if Hale, after agreeing to that step, changed his mind, and refused to accept that as a basis, and to continue the negotiation upon that basis, his conduct would be wrongful, and prevent any reliance by him in this action upon the defense that no actual consolidation had been effected, and that the compensation was therefore not earned. This brings us to the question as to whether, in the contract between Kumler and Hale, there is any express or implied agreement by which Hale would be liable as having wrongfully prevented performance, if, after provisionally agreeing upon some of the terms of a consolidation, he should change his mind in respect to the term or terms so provisionally settled, and refuse to proceed further with the formation of the contract, unless those terms were modified to his satisfaction. The whole charge of the circuit judge is based upon the assumption that any change of mind by Hale as to any term of consolidation, once agreed upon, would be in violation of Hale's obligation to Kumler, and prevent him from relying upon the defense of nonperformance when sued by Kumler. To this construction of Kumler's contract with Hale we must dissent. The principle contended for by the counsel for the defendant in error that, where one by his own wrongful act prevents full performance of a contract by the other party, the latter is thereby excused from such performance, is undeniably sound, and has been more than once announced and applied by this court. Dods-

worth v. Iron Works, 31 U. S. App. 292–300, 13 C. C. A. 552, and 66 Fed. 483; American Straw-Board Co. v. Haldeman Paper Co. (decided Nov. Sess. 1897) 83 Fed. 619.

But that principle has no application here, unless Hale was under some express or implied obligation to Kumler, whereby, having once accepted a basis for a contract of consolidation, he was bound to stand by that term, and on that basis proceed with the negotiation as to the terms remaining to be settled. But we fail to find any such express or implied provision in this contract. Not one single term upon which Hale would agree to a consolidation is stated in the authority under which Kumler acted. He therefore retained the right to exercise his own judgment in respect to all the terms and conditions necessary to a complete agreement. If, in the course of the negotiation, he should agree as to certain terms, such agreement was necessarily provisional, and was subject to retraction at any time before a complete settlement of all the essential terms of the contract. So long as the contract was in process of formation, the right to reconsider any term provisionally agreed upon remained to the negotiating principals, and we see no authority in the terms of the agreement between Kumler and Hale for implying a surrender of this liberty as between principal and agent. The uncertainty of a successful result from his efforts was doubtless taken into consideration when Kumler fixed his compensation. He took the chances of making a great sum or nothing, and left Hale at liberty to settle upon every term and condition, with the implied right, during the negotiation and while the contract was in process of formation, of reconsidering or retracting any term while only provisionally agreed upon.

If the terms and conditions upon which Hale was willing to consent to a consolidation had been stated in this agreement, and Kumler had then brought the opposite party to an assent to those terms, and Hale had then refused to do or have done the necessary corporate acts, there would be no doubt but that Kumler's compensation would have been earned. He would have brought the parties together, and obtained the necessary agreement for a consolidation, and if then his principal had reconsidered the matter, and refused to enter into a binding obligation, the fault would have been that of the principal, and the agents' compensation earned. But here Kumler was not authorized to bring about a sale or compensation upon any particular terms, nor was Hale under any agreement to accept any terms other than such as he could see fit to accept, and was under no obligation to agree to any consolidation unsatisfactory to him in any particular. Whether his reasons for being dissatisfied were good or bad is not a subject for inquiry. He reserved to himself the right to exercise his own judgment at every step of the negotiation. Suppose he had proceeded with the negotiation, though dissatisfied, and had imposed such further terms as to the capital stock of the new company, or its officers or name, as were wholly unacceptable to the Robisons, and had rejected counter propositions, which third parties might deem altogether reasonable; would evidence of the unreasonableness of his own

terms, and reasonableness of those rejected, have afforded ground for an action for the stipulated compensation? Clearly not, unless this contract is to be construed as taking from Hale all right to exercise his own judgment as to the terms and conditions, under penalty that if he was not content when, in the judgment of others, he should have been content, he should pay the very large compensation claimed by Kumler.

The facts of this case seem to bring it within the principles upon which the cases of Moffatt v. Laurie, 15 C. B. 583, and Walker v. Tirrell, 101 Mass. 257, were decided. In Moffatt v. Laurie the facts were that Laurie, an owner of land, contracted with Moffatt, a surveyor and architect, that if Moffatt would lay out and plat a tract of land belonging to him, making no charge for his services, in the event the land was disposed of for building purposes he should be paid a commission upon the buildings erected on the land. Moffatt performed his work, and, Laurie dying, his executors saw fit to dispose of the land for other than building purposes. Moffatt brought an action to recover compensation, upon the theory that Laurie was under obligation to do nothing which would prevent the land from being disposed of for building purposes so that he could earn his compensation. His action was defeated, Williams, J., saying:

"I entertained some doubt, during the course of the argument, whether a contract might not be implied on the part of Laurie and his executors that they would do no act to prevent the occurrence of the event on which the plaintiff's remuneration was made to depend. * * * But there is another difficulty in the plaintiff's way: The declaration is not framed so as to entitle the plaintiff to claim damages from the defendants for preventing him from acquiring the profit he is entitled to under the contract, but the plaintiff seeks to recover damages for improperly dispensing with his services. But, upon consideration, I think none of these points arise. The plaintiff agreed to prepare the plans gratis, and not to look to Laurie or his executors for any remuneration, unless certain events should happen which have not happened. If Laurie, or his executors, thought fit to change their minds as to the disposal of the property, I see nothing in the contract set out in the declaration to prevent them from so doing, or to give the plaintiff any right to damages in the event of their doing so."

Walker v. Tirrell, 101 Mass. 257, is more in point. That was an action in contract by a broker on a written agreement with the defendant for the sale or exchange of his land, with a count for services rendered in negotiations for such a sale. The contract sued on was as follows:

"If you send or cause to be sent to me, by advertisement or otherwise, any party with whom I may see fit and proper to effect a sale or exchange of my real estate above described, I will pay you $200."

The court said:

"The plaintiff declares on this contract, alleging its performance on his part, and adds a general count for his services in the performance of it. But although he made all proper efforts, and found a purchaser who offered to purchase the property, he did not find one with whom the defendant saw fit and proper to effect a sale or exchange. Thus it appears that the compensation is not due by the terms of the contract. He might have a claim for his services, if the sale or exchange fell through the fault of the defendant, upon the principles stated in Prickett v. Badger, 1 C. B. (N. S.) 296, and Cook v. Fiske, 12 Gray, 491. But no such fact appears. The defendant expressly reserved the

right to exercise his own judgment as to the fitness and propriety of making a sale to any person who might offer to purchase. There might be good reasons for reserving such a right, and it was legal to make a contract on those terms. The plaintiff might have required him to stipulate that he should assign good reasons for refusing to sell or exchange, and in such case it would have been necessary to pass upon the validity of the reasons assigned by him. But the plaintiff did not require such a stipulation, but agreed to leave the matter to his judgment, without requiring him to assign any reasons. The effect of this was to throw upon the plaintiff the risk of satisfying him. The compensation, then, by the terms of the agreement, was made to depend upon the completion of the sale or exchange. The court can not see that the compensation, in case of the completion of the contract, was not made larger in view of the risk. But this is not material. The point to be decided is, what are the terms of the contract? and, as it is found to contain a condition which has not been fulfilled, the plaintiff is not entitled to recover upon it; and, as it does not appear that the defendant is in fault, the plaintiff cannot recover upon a quantum meruit."

The condition upon which Kumler is entitled to recover compensation has not been fulfilled, and, as he has not been prevented from its performance by the wrongful conduct of Hale, the latter is entitled to rely upon the nonperformance of the condition.

This judgment must be reversed for error in not instructing the jury to find for the plaintiff in error.