## HOLTON v. JOB IRON & STEEL CO.

(Circuit Court of Appeals, Sixth Circuit. May 6, 1913.)

No. 2,293.

BROKERS (§ 63*)—CONTRACT—RIGHT TO COMMISSION—"PUT THROUGH."

Defendant, a corporation, desiring to move its plant to West Virginia, plaintiff endeavored to procure a bonus to be given by West Virginia parties to induce the change, contemplating a conveyance of 15 acres of ground, the erection of a structural building of a specified size, with certain switches, and the payment of $25,000 cash. Defendant agreed to pay plaintiff a specified commission "if this deal is put through." A tentative contract was drafted, but not executed, between persons representing the land, etc., to be contributed and defendant's officers. This contract provided for a transfer of the land and a payment of $25,000 toward the cost of erecting a building and installing a plant estimated to cost $180,000. The transaction was never completed. *Held,* that the term "put through" meant to carry or conduct to a successful termination; and plaintiff's engagement being not merely to obtain a party able and willing to enter into a given contract, but to bring the transaction about, and not having done so, he was not entitled to recover.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 79, 81, 94-96; Dec. Dig. § 63.*

For other definitions, see Words and Phrases, vol. 8, p. 7776.]

In Error to the Circuit Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by Dan H. Holton against the Job Iron & Steel Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Plaintiff sued to recover a commission claimed to have been earned under a contract for procuring a bonus in aid of the building and installation of a manufacturing plant. Upon the trial verdict was directed for defendant. The propriety of this direction is the principal question presented here.

Defendant was engaged in operating, at Ashland, Ky., a plant for the manufacture of metal sheets. The defendant corporation (or, as it claims, its principal stockholders and owners) desired to locate a plant at Kenova, W. Va. The Kenova-Huntington Land Company owned considerable land at Kenova, and so was interested in promoting the location of manufacturing corporations there. Plaintiff undertook to open negotiations with the Land Company upon the subject of bonus. On July 6, 1909, Job, who was apparently acting as defendant's president, gave plaintiff a letter stating that, if the parties owning the land at Kenova "are willing to deed to us fifteen (15) acres of ground and erect thereon a steel structural building" of a certain size and suitable to the needs of the projected plant, also to put in necessary switches, "we will cause to be incorporated a company for profit," with a capitalization between certain maximum and minimum limits, and to employ a number of men, whose maximum and minimum was also stated. Four days later, and on July 10, 1909, Job wrote plaintiff as follows: "Referring to our several conversations regarding the proposed bonus you are endeavoring to secure for us at Kenova, W. Va., from the Huntington & Kenova Land Company and other parties, will say that *if this deal is put through* we will be pleased to pay you in cash five (5) per cent. of the cost of buildings erected for us, or five (5) per cent. of the cash given us, in lieu of buildings, and also give you in stock of the company that operates in Kenova, five (5) per cent. of the cost of the buildings given us, or such cash bonus as we may receive. We reserving, however, the privilege of paying this commission all in cash, if we so desire." (All italics wherever found in this statement are ours.) On July 23d Job wrote plaintiff that: "We have decided, after a conference with our stockholders, to close up with the Huntington & Kenova Land Company for the location and operation of a plant at Kenova, W. Va., under the following conditions: Twenty-five thousand dollars ($25,000) in cash to be paid us *when a satisfactory bond is executed.* Fifteen (15) acres of land for a suitable site. Free switches to our site. An option on ten (10) additional acres at one dollar ($1.00) per acre, said ground to be held by the land company for us until our plant is put in operation."

The next day the Land Company wrote defendant, declining the proposition contained in the letter to plaintiff last referred to, but proposing to give $20,000 in cash "to be paid along during the construction of your buildings," to give 15 acres of land for a suitable site, and also land equal to 32 building lots of a certain size and in a certain location, together with free switches from a belt line to the proposed site; the donations of land and money to be made upon condition that defendant "*enter into a satisfactory contract with the Land Company* along the lines discussed when your representatives were here as to the installation of your plant, the number of employés, the length of time which the plant should be operated and *all further agreements made by* your representatives *which induced the donations* above given." August 4th the Land Company advised defendant by letter that the former's board of directors had appointed a committee with power to close negotiations for the location of the plant, the Land Company to give a cash bonus of $25,000, together with the site, building lots, and free switching provisions above referred to, "*provided a satisfactory contract is entered into* by you with this company. The *selection of the site* for the plant *and the lots* and the *terms of the contract* to be *left to the committee* appointed and *your representatives.*" At some date (probably between August 4th and August 6th) the acting president, the secretary-treasurer, and the superintendent of defendant met with the authorized representatives of the Land Company. At this afternoon meeting a draft of a proposed contract between defendant and the Land Company was prepared by the latter's attorney.

Plaintiff's evidence tended to show that the representatives of both parties were present during the actual dictation of the contract to a stenographer, and that as questions from time to time arose they were discussed and the dictation made to cover the agreements from time to time reached, and that the contract as dictated embodied the agreements and concessions of the parties as then and there made; that the contract was to be written up, and that in the evening the parties "were to come back and *go over it;* it was agreed upon, and they were to come back and sign it"; that in the evening all the parties present at the afternoon meeting appeared, except defendant's secretary-treasurer. who had been called home; that the parties present went over the contract and agreed to it; that the two other representatives of defendant agreed that the secretary would return the next day with the corporate seal and that the contract would then be executed. The parties claimed to represent defendant did not appear the next day, and the draft of contract was never executed, and nothing further was done in the way of carrying out the proposed deal.

Upon the trial Job assigned, as reasons why the contract was not signed at the time: (a) That it was to have been the individual contract of four principal owners of the corporation, and not that of the corporation itself: (b) that the contract was to be submitted to the attorney of those parties; and (c) that the freight rates at Kenova were to be made the same as at Ashland. The secretary testified that the provisions for forfeitures and for bond (at another place in the record printed as "bonus") were unsatisfactory, saying: "No sane man would sign such a contract. It could not be complied with." Plaintiff testified that Job told him on August 6th that he expected to carry out the contract, but a little later announced that it could not be executed because of inability to finance the enterprise, especially (it would appear) in taking care of loans at the Ashland bank, which Job thought would be called if the location at Kenova was made. Such, in substance, we construe to have been the reason given by Job to the Land Company on August 13th for the Iron Company's declination of the Land Company's "proposition." All the correspondence and negotiations referred to were had in 1909.

The draft of proposed contract provided that the Land Company should (a) give $25,000 towards the cost of erecting the building and installing the plant (estimated to cost $180,000), to be paid from time to time as the work of erection and installation progressed and in the same proportion that the remaining $155,000 should be paid by defendant: (b) convey 15 acres of land and 32 lots described; (c) procure certain switching privileges—the lots and the 15 acres to be conveyed only on defendant's furnishing bond with a good and solvent surety company as surety, *to be approved by the Land Company.* in the penalty of $36,000, conditioned for the performance "of every condition of this contract," and to remain in force "until each and every condition to be performed by the party of the second part has been fully and completely performed." The draft of contract provided that defendant should erect and install a building and plant "estimated to cost not less than $180,000." the building to be not less than 680 feet long by 130 feet wide; that the 15 acres should be used only for manufacturing purposes: that the operation of the plant should begin by April 1, 1910; that operation should continue for 12 months thereafter (with not less than a certain number of men "regularly employed for a period of 12 months"), except as interrupted by strikes or other named contingencies, the operation to cover the period of such interruptions in addition to the 12 months; and that in case of defendant's failure to carry out all of its proposed agreements it should, at the option of the Land Company, pay to the latter $300 per acre for the 15 acres and $200 for each of the 32 lots, plus the $25,000 cash bonus, with interest thereon, "as liquidated damages for and in lieu of its failure to so fully and completely carry out the premises and conditions of this contract."

Williams, Scott & Lovett, of Huntington, W. Va., and Hager & Stewart, of Ashland, Ky., for plaintiff in error.

S. S. Willis, of Ashland, Ky., for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

KNAPPEN, Circuit Judge (after stating the facts as above). We pass by all questions except the single one whether, as matter of law, the evidence tended to show that plaintiff had "put through" a deal between defendant and the Land Company within the meaning of the contract, assuming, for the purposes of this opinion (but not deciding), that the defendant ·corporation was, in the negotiation of the contract, effectively represented by Job and his associates.

Plaintiff relies upon the letter of July 10th as containing the contract sued upon. The promise contained in that letter is to pay the commission only in case the "deal is put through." The District Judge was of opinion that, as matter of law, the required condition had not been performed. We think this the correct view. The Century Dictionary defines the term "put through" as "to carry or conduct to a successful termination." The question thus is: Did the evidence tend to show that the proposed deal was carried to, a successful termination? An affirmative answer to this question requires, first, the existence of a "deal" or contract between defendant and the Land Company; and, second, the carrying into effect of such deal.

It is readily apparent that defendant did not promise to pay plaintiff a commission for merely obtaining a party able and willing to enter into a given contract. The agreement does not so provide. On the contrary, it provides only for payment if the deal is "put through." The rule applicable to ordinary cases of brokerage contract to furnish a purchaser (as recognized in cases such as Kock v. Emmerling, 22 How. 69, 16 L. Ed. 292) has thus no application. Moreover, not only does the contract relied upon fail to state the terms of a deal which would be satisfactory to defendant, but reference to the letter of July 6th (which it is claimed formed the basis for the alleged contract of July 10th) shows that the deal then in mind was never carried out, for that contemplated deal embraced the entire furnishing of a building, while the performance relied upon, so far as the building is concerned, embraces only a contribution of $25,000 toward the erection of a building and installation of a plant, estimated to cost $180,000. It is also evident that, until the parties met at the time the draft of contract was prepared, the details of a deal between them had never been agreed upon, for there remained open for negotiation and agreement the making of a "satisfactory contract," the terms of which (and of the proposed bond), as well (it would appear) as the selection of the acreage site and the lots, were still left "to the committee appointed and your representatives." Nor was there in existence any prior contract between plaintiff and defendant for the payment of commission on the procuring, or even on the putting through, of a deal embodying all the terms contained in such draft of contract. It follows that no generosity of proposal made by the Land Company would entitle plaintiff to a commission, unless, at least, such proposal ripened into an actually accomplished deal. Hale v. Kumler, 85 Fed. 161, 29 C. C. A. 67.

The question then is: Did what took place in connection with the preparation of draft ·of contract amount to a "putting through" of

a deal? It seems clear it did not. We think the District Judge correctly interpreted the contract as meaning:

"If you make a deal between us and the Kenova-Huntington Land Company, and the deal is put through, and the buildings are erected, or the cash given, then we will pay you this commission."

It would seem true that if the parties had executed the contract as drafted, and defendant had thereafter, to prevent its performance, refused to carry it out (whether in respect to giving of bond, or otherwise), plaintiff would be entitled to commission by virtue of an implied agreement not to prevent performance. But the contract was never executed, and we think the "deal" was never effectively made. It cannot be maintained that the effect of the approval by defendant's representatives of the various terms of the proposed contract, as the same was being dictated, was tantamount, in legal effect, to an actual execution of the contract; for the parties plainly understood and intended that the contract was not effective until actually executed and delivered, and such was the legal situation. And until so executed and delivered we think it was subject to withdrawal by either party. Surely the expression of approval of the completed draft by two of defendant's representatives, in the absence of the third, in connection with the postponement of the time of execution, did not amount to a contract. Moreover, the contract as drafted was, at the most, merely executory. No bonus was to be paid or conveyance made under it until the execution by defendant of a bond for $36,000, with surety approved by the Land Company, the actual form and language of which bond were not agreed upon, except in general terms.

Still further, the bonus was not to be paid on the signing of the contract, or even on the execution of the bond, but only as the erection and installation progressed, and in connection with defendant's contributions toward the same. Were it to be conceded, for the purposes of argument, that an arbitrary and capricious refusal on the part of the defendant to execute the draft of contract would entitle plaintiff to commission, such concession would be of no value, for the evidence does not indicate that defendant's refusal (so far as concerns the objection of financial inability) was arbitrary or capricious. On the other hand, there is no attempt to show the falsity of the representations of financial inability; and it might well be that the requirement of surety bond in the amount provided, to continue in effect at least until April 1, 1911 (a period of one year and eight months), and perhaps longer, securing not only the repayment of the bonus paid, but a substantial amount in addition (on account of the price of the site and lots), as liquidated damages for defendant's failure to carry out the conditions of the contract (including the practically continuous operation of the plant), might well prove so onerous as to be impracticable, and even prohibitive.

It results from these views that the judgment of the Circuit Court should be affirmed, with costs.