## ANDERSON v. GRIEVES.

### No. 1414.

Circuit Court of Appeals, Tenth Circuit.

Aug. 18, 1937.

W. L. Huggins and L. W. Raynolds, both of Emporia, Kan., for appellant.

L. A. Rowland, of Bartlesville, Okl. (J. D. Talbott, of Bartlesville, Okl., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

Appellant sued for a broker's commission. In his complaint he alleges that defendant—

"orally agreed with said plaintiff that in event a sale be consummated of any real estate or any personal property owned by defendant, or that the same be exchanged, for other property, that he, the defendant, would pay plaintiff for his services the usual and customary rate of commission * * *.

"That pursuant to said agreement of employment this plaintiff did negotiate with various persons and corporations for an exchange of property owned by the defendant. * * *

"That plaintiff through such negotiations procured parties, willing, ready and able to exchange income investment properties for real estate and personal property owned by the defendant, and that said parties did on the 3rd day of March, 1932, enter into a written contract for the exchange of such properties. * * *

"That thereafter said defendant repudiated such contract and refused to consummate said transaction."

Appellee admits the employment by him of appellant as stated in the complaint, but denies that appellant procured parties ready, willing and able to make the exchange as alleged in the complaint. He admits that the instrument, Exhibit A, attached to plaintiff's complaint was signed by him, but alleges that it never became a binding contract to make the exchange. He denies that the other party, Snyder Realty and Investment Company, who signed said Exhibit A owned the property which was proposed to be given in exchange for appellee's property; that said Exhibit A was a mere option given to Snyder Realty and Investment Company without consideration therefor and revoked by appellee before the term of the option expired; that under the contract between appellee and appellant no commission was to be paid appellant unless there should be a consummated sale or exchange; and that there was no consummated transaction nor any binding agreement therefor.

Appellee's property to be put into the proposed exchange consisted of about 18,000 acres of land lying partly in northern Oklahoma and partly in southwestern Kansas, about 1850 head of white face cattle, saddle horses, and other equipment for a cattle ranch. The ranch and the live stock on it were heavily mortgaged. There were also some negotiable instruments of questionable value that were to be put into the deal. The alleged contract (Exhibit A) also set out a description of the property that was to be given in exchange for the ranch, cattle and equipment. It is described as an apartment building known as Park Central Apartment Hotel on East Armour Boulevard in Kansas City, Missouri. It also was heavily mortgaged, a first mortgage in the sum of $225,000, a purported second mortgage for $100,000, and a $7000 chattel mortgage on the furniture in said building. This property all belonged to Park Central Investment Company, a corporation.

Appellant Anderson heard that the owners of this building might be induced to trade it for a good cattle ranch, and he asked Grieves to go to Kansas City with him and they would look it up. They went sometime in February, 1932. Grieves testified that the next morning after they got there, "a kind of cowboy came into the hotel and he seemed to be the man who had the stuff for sale." He did not remember his name, but they went to the apartment hotel. They went to Mr. Danielson's office and talked to him about this apartment. Then they looked at some other apartments. He also met Mr. Snyder of the Snyder Realty and Investment Company on that trip. Snyder and two others were in the party when they looked over the apartment hotel. Grieves decided he did not want it and went back to Oklahoma, his home. A little later he decided to look it over again with his son-in-law who lived in Kansas City. He and Anderson went back to Kansas City about the first of March and remained there about five days, being with Mr. Danielson much of the time. Mr. Danielson apparently was acting as agent to sell the apartment hotel or exchange it for a cattle ranch. Mr. Grieves was in the office of the Snyder Realty and Investment Company on his first trip to Kansas City, and he testified that Mr. Snyder on that occasion told him the apartment hotel property had been appraised

by the Real Estate Board of Kansas City at $550,000. He was corroborated in this by the testimony of Mr. Tuttle who was with him at the time. On his second trip to Kansas City Mr. Danielson prepared a contract, which is Exhibit A to the complaint, for the exchange. Just how he came to do this does not appear, whether on his own motion or at the request of someone. He presented it to Mr. Grieves for his signature, and he signed it in Danielson's office. He testified that at the time he did so he told Danielson it was not to be delivered until he found out about the appraisement of the Real Estate Board. After that he went back to Danielson's office and found that Danielson had delivered that contract to Snyder, and Snyder had signed it for his company. After that Grieves went to Snyder's office. Danielson was there, and he told him he did not want anything more to do with it. Snyder then told him that the Real Estate Board of Kansas City had not appraised the property, and Snyder made out his affidavit at that time that some insurance man had appraised the property at $550,000. As he was leaving Snyder said to him not to do anything more about the matter or incur any expense on the abstract until he called him. Snyder testified in substance that Grieves took his affidavit that an agent for an insurance company had appraised the property in place of an appraisement by the Real Estate Board of Kansas City. Grieves was corroborated as to what was said on that occasion by two witnesses, and Snyder was corroborated by other witnesses. As a matter of fact it appears that no appraisement was made by the Board.

The case was tried by the court without a jury. The Judge made findings of fact and conclusions of law. Among the findings of facts are these:

"One W. D. Snyder, who is Vice-President of the Snyder Realty and Investment Company, represented to the defendant that the Park Central Hotel had previously been appraised by the real estate board of Kansas City, Missouri, at a value in excess of Five Hundred Thousand Dollars ($500,-000.00) when as a matter of fact, such real estate board had not made any appraisement of such property. That the said W. D. Snyder represented to Grieves that there were two mortgages against the property, one for Two Hundred and Twenty-five Thousand Dollars ($225,000.00) and one for One Hundred Thousand Dollars ($100,-000.00). That as a matter of fact, only one mortgage was standing against the property for Two Hundred and Twenty-five Thousand Dollars ($225,000.00) there being no such One Hundred Thousand Dollar ($100,000.00) mortgage. The contract in question was signed by Snyder Realty and Investment Company by W. D. Snyder, Vice-President, and John B. Grieves. * * *

"The court finds that the defendant Grieves believed and relied upon the representations of said Snyder and was overreached in that the instrument (the contract in question) was delivered to the Snyder Realty and Investment Company in violation of instructions given by defendant Grieves to one F. E. Danielson, agent for the Snyder Company; that the minds of the parties did not fully meet in the execution and delivery of the said contract."

In part the court concluded as matter of law:

"That by reason of the misrepresentation on the part of the Snyder Investment Company and the incomplete execution of the alleged contract, such contract did not become binding and effective."

There were other findings of fact and conclusions in favor of appellee relating to other separate defenses.

Each party was to convey or cause to be conveyed to the other by warranty deed subject to incumbrances named in the contract. Snyder Realty and Investment Company, a corporation, signed the contract not as agent but as in its own right. It named Danielson as its agent. The equity in the apartment property known as Park Central Apartment Hotel was owned by Park Central Investment Company, a corporation with $2000 capital, and the principal owner of the stock was a Mr. Hawkinson, its president. He was also secretary of the Swedish American Savings and Loan Association, which association was named as a third party to the contract, but it did not sign the contract. Mr. Grieves was not informed that the Park Central Investment Company was the owner of the apartment hotel. He did not know that until he was later sued by it for breach of contract, which case it lost on trial, that case having been tried also without a jury after having been joined with this case for trial purposes. The financial history of the apartment hotel was bad. Apparently the Snyder Company had owned it for a while. It issued its bonds or notes

against it in the sum of $450,000 secured by mortgage prior to the transactions now in hand. That mortgage was foreclosed, and the apartment property was sold on foreclosure for $165,000. Mr. Hawkinson held a large amount of those bonds. He bought at the sale. He has never met Mr. Grieves. The remainder of the Snyder bonds, $285,000, are unpaid. It looks like a bad case of inflation among friends. Snyder's representations of value are not worth much in view of his own company's experience as owner of the property. It does not seem to us a mere incident that neither Snyder nor Danielson told Grieves who really owned the Kansas City property. Concealment of the true facts is sometimes as fraudulent as a false statement. Mr. Hawkinson was in touch with the negotiations with Grieves, approved them, and prepared a deed executed by the Park Central Investment Company to be delivered in event the parties to the contract, Snyder Realty and Investment Company and Grieves, should agree on the exchange, but not naming the grantee in the deed. So far as the record shows Mr. Grieves knew nothing whatever about Mr. Hawkinson, the experience that he had had with the Kansas City property, or that his company, the Park Central Company, was the real owner of the equity until that company sued for breach of contract.

Danielson testified at some length in favor of plaintiff, appellant here. He testified in chief that he was representing the owners of the property in Kansas City. He was asked who the owner was. He replied that he thought it was known as the Snyder Realty and Investment Company or the Park Central Investment Company. His attention was called to the fact that the Park Central Investment Company had sued Grieves for breach of contract, and was then asked whether that was the company he represented at that time. He answered: "It was." Later on he said that during the time he was consulting the Park Central people as to what they might be willing to do. On cross-examination he testified that he represented the Snyder Realty and Investment Company and took his instructions from that company. His attention was directed to the fact that the first mortgage or deed of trust on the Park Central property mentioned in the claimed contract was for $225,000 and that a second deed of trust or mortgage for $100,000

was named in the contract to be assumed by Grieves. He said he got that information from the Snyder Company; that the $100,000 mortgage had not been recorded but was to be prepared simultaneously with closing the contract. He was asked as to who was to hold this $100,000 mortgage and who was to execute it. He said that Grieves wasn't to sign the mortgage note and he could not tell who was to execute it; he did not know; and that deals in Kansas City were frequently made in that manner. He was asked if he did not know that the property did not belong to the Snyder Company at the time he drew the contract. His reply was that he did not know how the title stood. He was asked whether he told Grieves that the property was owned by the Park Central Investment Company. He answered that he did not think that ever came up; that he did not think he ever told Grieves who was the true owner.

Mr. Snyder testified that the financial condition of his company was bad; that he expected that both he and Danielson were representing the Park Central Investment Company, but that during the negotiations with Mr. Grieves there was no discussion about the Park Central Company owning the property; that he had represented to Grieves that there was a first mortgage of $225,000 and a mortgage of $100,000 to be placed.

Mr. Hawkinson testified that the Park Central Company had a capital stock of $2000; that he and his family owned all of it; that he had drawn a deed from his company leaving the name of the grantee blank because he did not know whether it was going straight to Grieves or to the Snyder Company and that was to be determined later; that he had no connection with Mr. Grieves; that he had never met Mr. Grieves; that his company was able, ready and willing to carry out the terms of the contract entered into by the Snyder Investment Company and Grieves.

The foregoing statement of the situation is made not with the idea of its bearing on the relative rights of Grieves, the Snyder Company, and the Park Central Company, but for the purpose of consideration in connection with the terms of the contract between Anderson and Grieves as stated in Anderson's complaint; an oral contract, "that in event a sale be consummated of any real estate or any personal property owned by defendant or that the same be exchanged

for other property that he, the defendant, would pay plaintiff for his services the usual and customary rate of commission * * *." We are not dealing with the simple case where the property owner employs an agent to sell specific property at a named price. In that case when the agent presents one willing, ready and able to pay the price he has earned the commission, and it is no defense that the property owner has changed his mind. That is far from the situation here in hand. The agent agreed in this case that nothing would be due him unless a sale or exchange was consummated. Anderson apparently did nothing after he took Grieves to Kansas City and brought him in contact with Danielson and Snyder, so far as the record shows. He testified. Apparently he merely stood by. He did not know who owned the Park Central Apartment Hotel. He expressed no interest in the contract that Danielson drew and made no suggestion whatever about its terms. He had as well been elsewhere. He had agreed that Grieves would owe him nothing unless an exchange was actually made. Indeed, it was his duty to find someone who had property and who was able, ready and willing to exchange it for Grieves' property, if the property was acceptable to Grieves. It is true that Grieves and the Snyder Company each signed a written contract for the exchange, but the court below found that the execution of the contract was induced by a false representation on the part of Snyder as to its value so that Grieves was released from its obligations. Had Anderson participated, ascertained who the real owner of the property was and the truth as to present controverted facts and imparted his information to Grieves, invalidity of the contract for fraud could never have arisen, and we think Anderson's right to commission in the absence of a consummated exchange is dependent on a valid contract binding Grieves as well as Snyder's Company thereto. We do not mean to say that Grieves was not negligent in his dealing with Danielson and Snyder, but Anderson was at the same time negligent of his own rights. He signed the invalid contract as a witness to Grieves' signature. Hale v. Kumler (C.C.A.) 85 F. 161; Holton v. Job Iron & Steel Co. (C.C.A.) 204 F. 947; Colvin v. Post Mtg. & Land Co., 225 N.Y. 510, 122 N.E. 454; Preston v. Postel (D. C.) 300 F. 134; Morse v. Conley, 83 N.J. Law, 416, 85 A. 196; Hopkins v. Settles, 46 Okl. 801, 149 P. 890; Ormsby v. Graham, 123 Iowa, 202, 98 N.W. 724; Johnson v. Sutton, 94 Miss. 544, 49 So. 970. In Gould v. Stewart, 111 Kan. 41, 206 P. 309, 310, the court said: "Ordinarily the commission is earned when the agent finds a purchaser ready, able, and willing to take the seller's property on the terms offered. But a contract to pay a commission when such purchaser is found only in case the deal actually goes through is a different thing. We see nothing unlawful or immoral in such a contract." It will be borne in mind that Grieves did not prevent the carrying out of a binding contract for the exchange of properties, but an invalid one prepared by the party to whom Anderson presented Grieves.

Affirmed.